(No. 105530.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. ANDRE RICHARDSON, Appellee.

*Opinion filed September 24, 2009.*

Lisa Madigan, Attorney General, of Springfield, and Richard A. Devine and Anita Alvarez, State's Attorneys, of Chicago (James E. Fitzgerald, Ashley A. Romito, Annette Collins and Veronica Calderon Malavia, Assistant State's Attorneys, of counsel), for the People.

Michael J. Pelletier, State Appellate Defender, Patricia Unsinn, Deputy Defender, and Melissa C. Chiang, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellee.

JUSTICE FREEMAN delivered the judgment of the court, with opinion.

Chief Justice Fitzgerald and Justices Thomas, Kilbride, Garman, Karmeier, and Burke concurred in the judgment and opinion.

## OPINION

Defendant, Andre Richardson, was charged in the circuit court of Cook County with first degree murder (720 ILCS 5/9—1(a)(1), (a)(2) (West 2000)). Following a jury trial, defendant was convicted as charged and sentenced to a prison term of 40 years. The appellate court reversed defendant's conviction and remanded for a new trial. 376 Ill. App. 3d 537. We allowed the State's petition for leave to appeal. 177 Ill. 2d R. 315(a). We now reverse the judgment of the appellate court and remand the cause to that court for further proceedings.

## I. BACKGROUND

Defendant's conviction arose from events occurring on February 9, 2001. At 2:20 p.m., Chicago Police Officer Michael Hayes and paramedics responded to a call of an injured child at defendant's home. Defendant told Officer Hayes that the victim, his 11-month-old daughter, Diamond Clark, had fallen in the bathtub. However, the victim exhibited wounds, including human bite marks, that were inconsistent with a fall in a bathtub.[1] Officer Hayes, accompanied by defendant, went to the hospital where the victim was receiving treatment. Upon ascer-

---

[1] The victim later died of her injuries at 11:45 p.m.

taining the victim's condition, Officer Hayes arrested defendant for child abuse or aggravated battery of a child. Officer Hayes brought defendant to the 2nd District police station at 3:35 p.m. At that time, defendant had no marks on his face. Officer Hayes processed the arrest report, and turned defendant and the paperwork over to the lockup keeper. At some point after being brought to the 2nd District police station, defendant received a black eye in the lockup. Sometime after 9:08 p.m., defendant gave an inculpatory statement to police, which he repeated in the presence of a Cook County assistant State's Attorney sometime after 12:30 a.m. on February 10.

Prior to trial, defendant sought to suppress the statement he gave to police. His amended motion alleged that defendant had been interrogated by Chicago Police Detectives O'Connell and Zalatoris, Youth Investigator Nolan, and Assistant State's Attorney John Heil. The motion further alleged that defendant had not been advised of his *Miranda* rights prior to the interrogation, but rather that he had been informed of his rights only after Assistant State's Attorney Heil had arrived. The amended motion further alleged that defendant's "physical, physiological, mental, educational and/or psychological state, capacity and condition" rendered him unable to appreciate and understand the full meaning of his *Miranda* rights. The amended motion also alleged:

"That the statements sought to be suppressed were obtained as a result of physical coercion illegally directed against the defendant and that such statements were, therefore, involuntary in violation of the 5th and 14th Amendments to the United States Constitution. [Defendant] was grabbed by one of the detectives and pushed onto a stool. The detectives handcuffed [defendant] to the wall. The detectives repeatedly called [defendant's] mother a bitch, told her to shut up and repeatedly yelled at her. There were two big detectives, one detective was O'Connell.

[Defendant] was choked in the lockup where he passed out and hit his face and head and he told [defendant] he would be raped in prison."

The motion alleged additional mental coercion, in that defendant "was told by the detectives if he made a statement, he would go home" and, prior to questioning, "several members of the police department approached and told him that he would never go home." The circuit court held a hearing on the motion.

## A. Suppression Hearing

The State presented the following pertinent testimony from several witnesses.[2] Michael Nolan testified that, on February 9, 2001, he was a youth investigator assigned to Area 1 headquarters of the Chicago police department. His duties included investigating offenses against children and processing juvenile arrests. At approximately 5 p.m., Nolan was assigned to the investigation of defendant's alleged abuse of his baby daughter. Nolan was also advised that defendant was already in custody at the 2nd District police station, located at 5101 S. Wentworth Avenue. Area 1 of the Chicago police department includes the 2nd District, and Area 1 headquarters is located in the same building as the 2nd District police station. The first floor of the building is known as "the 2nd District," while the second floor is known as "Area 1." Nolan went downstairs to the 2nd District, where he found defendant and the arresting officer, Michael Hayes, in an interview room near the station lockup. Defendant, then 16 years old, was held separated from adult detainees. Nolan spoke with Officer Hayes for a few minutes. Nolan did not notice any facial injuries to defendant.

---

[2]See 725 ILCS 5/114—11(d) (West 2000) ("The burden of going forward with the evidence and the burden of proving that a confession was voluntary shall be on the State"); *People v. Strayhorn*, 35 Ill. 2d 41, 46 (1965).

Nolan then traveled to Wyler Children's Hospital to ascertain the victim's condition. He next went to the crime scene at 4837 S. St. Lawrence Avenue, where he met Chicago Police Detectives John Zalatoris and Edward O'Connell. They returned to Area 1 headquarters between 7:30 and 8 p.m. Nolan again found Officer Hayes with defendant in the same interview room in the 2nd District. This time, however, Nolan observed that defendant's left eye was swollen. Nolan, "very surprised," asked Hayes what had happened, but defendant personally answered the question. Defendant told Nolan that "while he was being processed in the lockup that one of the lockup personnel struck him in the face," or "somebody in the lockup punched him in the eye." Defendant did not ask to go to the hospital and did not complain of any pain. Nolan asked Officer Hayes whether he had contacted his superiors. Hayes informed Nolan that the desk sergeant and the watch commander had been notified, that the incident had been reported to the police department Office of Professional Standards, and that Professional Standards "was already involved."[3]

Defendant's mother, Ellen Gaston Bronaugh, had arrived at the 2nd District. Nolan then had defendant and defendant's mother brought upstairs to an interview room at Area 1 for questioning. At 9:08 p.m., Nolan and Detectives Zalatoris and O'Connell had a conversation with defendant, who was not handcuffed, in the presence of his mother. Nolan first gave defendant *Miranda* warnings, and also warned defendant that he could be tried as

---

[3]Early in the course of the State's presentation of its evidence, the circuit court received the Professional Standards file on the lockup incident pursuant to defense counsel's subpoena. After an *in camera* inspection, the court concluded that the Professional Standards file was relevant to whether defendant's inculpatory statement was voluntary. Accordingly, the court tendered the file to the defense.

an adult. Defendant responded that he understood his rights and agreed to give a statement. After defendant gave an innocent explanation, Nolan and the detectives confronted defendant with the several bruises and bite marks on the victim's body. Defendant then gave an inculpatory statement. This interview lasted between 45 minutes and one hour. A Cook County assistant State's Attorney was called.

Nolan testified that neither he nor anyone in his presence pushed defendant onto a stool or punched defendant. At no time did defendant fall or hit his head while attempting to avoid the punches of Nolan or anyone in Nolan's presence. Neither Nolan nor anyone in Nolan's presence cursed or shouted at defendant's mother, told defendant that he would never go home or that he would be raped in prison, or told defendant that if he made a statement he could go home.

Detective Zalatoris testified that on February 9, 2001, at approximately 6 p.m., he and his partner, Detective O'Connell, were assigned to investigate the aggravated battery of a child. They traveled to the crime scene and met Youth Investigator Nolan. Zalatoris learned that defendant was in custody. He, O'Connell, and Nolan returned to Area 1 "maybe a little bit after" 7 p.m.

Zalatoris first saw defendant as he was being led to an Area 1 interview room. Defendant's eye was injured. Prior to meeting defendant, Zalatoris already was informed that defendant received a black eye in the lockup. Zalatoris also learned that the 2nd District had already notified the Office of Professional Standards of defendant's injury. Zalatoris explained that he did not personally document defendant's injury because Professional Standards was going to investigate and would require 2nd District personnel to explain the injury as opposed to any Area 1 personnel. Office of Professional Standards personnel did arrive at Area 1, but Zalatoris

did not recall at what time they tried to speak with defendant. In any event, Zalatoris explained that the criminal investigation superseded the Professional Standards administrative investigation and Professional Standards investigators would have to wait to interview defendant until after the criminal investigation was complete.

According to Zalatoris, defendant and his mother had an opportunity to be alone together prior to the 9:08 p.m. interview. In addition to Zalatoris, defendant and his mother, O'Connell, and Nolan were present. Zalatoris asked defendant how he received his injury, and defendant replied that "one of the guys downstairs hit him in the lockup." Defendant, or his mother, never complained of any pain regarding his eye and did not want to go to a hospital. Neither Zalatoris nor O'Connell nor Nolan physically assaulted defendant in any way, including punching him, or causing him to fall and hit his head, or pushing him onto a stool. Zalatoris stated that no one threatened defendant in any way, including telling him that he would never go home again, or that he would be raped in prison. No one offered any inducements to defendant, including promises that if he made a statement he could go home. Zalatoris denied that anyone cursed at defendant's mother or shouted at her. At the conclusion of this interview, all three officers left the room to call a Cook County assistant State's Attorney. Zalatoris had no further interaction with defendant. That was the extent of Detective Zalatoris' interaction with defendant.

Detective O'Connell's testimony was similar to that of Zalatoris in all material respects. Further, on cross-examination, O'Connell testified that the lockup keeper fingerprints arrestees. Defense counsel asked O'Connell whether defendant told him "that the person who was fingerprinting him choked him, and that he finally passed

out and bang[ed] his head." O'Connell answered that defendant "said he just got hit" by the lockup keeper. O'Connell denied that he or any of the officers grabbed or pushed defendant onto a stool, or cursed and shouted at defendant's mother, or otherwise threatened or coerced defendant to make a statement.

Cook County Assistant State's Attorney John Heil arrived at Chicago police department Area 1 headquarters at approximately 10 p.m. Heil spoke with Detectives O'Connell and Zalatoris and Youth Investigator Nolan. They told Heil that defendant had a swollen left eye, that the injury occurred in the police station lockup, and that a Professional Standards investigation was under way. Heil, Zalatoris, and Nolan then traveled to Wyler Children's Hospital to ascertain the victim's condition. Heil learned that the victim died either when he was leaving the hospital or upon his return to Area 1.

They returned to Area 1 at approximately 12:30 a.m. on February 10. Heil, along with O'Connell and Nolan, entered an interview room where defendant was sitting, not handcuffed, beside his mother, Ellen Bronaugh. Heil immediately observed that defendant's left eye was swollen. Heil introduced himself to defendant and Bronaugh and explained his role as a prosecutor. Heil next gave defendant *Miranda* warnings, warned defendant that he would be tried as an adult and, according to Nolan's testimony, informed defendant that the victim had died. Defendant then agreed to speak with Heil. Initially, Heil asked defendant how he received the eye injury. Defendant answered that his eye was injured "while he was in the lockup." Defendant then repeated his oral inculpatory statement. After listening to defendant's oral statement, Heil asked O'Connell and Nolan to leave the room. With only himself, defendant, and Bronaugh present, Heil then questioned defendant regarding his treatment at Area 1. According to Heil: "Defendant told me he had

been treated fine. He indicated to me that what he had been telling me was the truth and had nothing to do with what happened earlier with regard to his eye." Defendant acknowledged that the detectives provided him with food and drink, restroom access when needed, and time to sleep. Defendant again told Heil that his eye injury "happened while he was in the lockup." Defendant stated that he was not in pain and did not need medical attention. Heil then asked O'Connell and Nolan back into the interview room. Heil next explained to defendant his options for memorializing his statement. Defendant chose to make a videotaped statement. This session lasted between 30 and 45 minutes.

At approximately 9:27 a.m. on February 10, 2001, defendant made a videotaped statement, which was played in open court. The video shows defendant sitting at the head of a small conference table. Sitting on either side of defendant were Heil, O'Connell, Nolan, and defendant's mother. In the video, defendant received *Miranda* warnings and stated that his eye injury occurred in the police lockup. It was not caused by the arresting officer or any Area 1 detective. Further, defendant maintained that his statement had nothing to do with his eye injury.

Answering Heil's questions, defendant concluded the statement as follows. Heil and the Area 1 detectives had treated defendant fairly. Defendant's mother was present during questioning, and the detectives allowed defendant and his mother time alone. Defendant slept, ate, drank, and had restroom access. Defendant denied being under the influence of alcohol or drugs. Neither Heil, Nolan, nor the detectives made any threats or promises to defendant or his mother in exchange for defendant's statement.

At the conclusion of the State's evidence, the circuit court denied defendant's motion for a directed finding of

suppression. The court reviewed the evidence, including the undisputed evidence of defendant's injured left eye, his accusation that a police department employee had punched him in the eye in the lockup, and that the Office of Professional Standards was investigating the incident. The court found that defendant did not complain of any pain; he was not handcuffed; he understood and waived his rights; he was never questioned outside the presence of the youth investigator or his mother; and both defendant and his mother appeared "cool, calm, and collected throughout the statement." The circuit court observed that the motion to suppress alleged that police detectives cursed at defendant's mother. However, the court found: "I've reviewed the statement, watched his mother throughout the 20 minutes, she shakes her head in agreement a few times during the defendant's statement. At no time [does she] appear[ ] in the least bit agitated, nor does the defendant." The circuit court then found that the evidence was "overwhelming that he [defendant] was advised of his rights, understood his rights, was not threatened or coerced in any manner to give a statement implicating himself regarding the death of his daughter." Based on "the totality of the circumstances," including "all of those involved with the taping of the defendant's statement, the Court finds it was given freely and voluntarily and not in violation of any of the defendant's constitutional rights." The circuit court ruled: "Your motion to grant a motion to suppress at the close of the State's case is respectfully denied." The hearing proceeded with the defense presenting its evidence in support of the motion to suppress.

Defendant's mother, Ellen Gaston Bronaugh, was the sole defense witness at the suppression hearing. She testified that at approximately 5 p.m. on February 9, 2001, she received a telephone call from police requesting her presence at the 2nd District police station because

defendant "was in trouble." Upon her arrival, she was taken to a room where she encountered two detectives, two uniformed officers, and defendant, who was handcuffed to a pole. She did not have an opportunity to speak with defendant at that time, but he appeared to have no injuries. A question arose concerning defendant's age: defendant had told officers that he was 17 years old, but Bronaugh claimed that he was 16 years old. Officers drove Bronaugh to her home to obtain proof of defendant's age. She returned to the police station in about 20 minutes.

At approximately 5:30 p.m., Bronaugh was standing in a hallway speaking with an officer when she heard defendant "screaming and hollering" from the same room where she had last seen him. Through the open door, she heard defendant shout, "That mother fucker hit me, put me in a choke hold and I passed out." Bronaugh entered the room and saw defendant sitting with a single officer. Defendant told Bronaugh that a uniformed guard in the lockup injured him. He complained that the guard "put him in a full Nelson and he passed out." Bronaugh noticed that defendant "had a big old knot over his eye." Bronaugh asked defendant how his eye was injured. Defendant responded that he hit his face when he passed out. Upon hearing defendant's accusation, Bronaugh began complaining to officers and demanding "to talk to somebody." A sergeant passed by and asked what was wrong. Bronaugh informed him of defendant's injury. The sergeant spoke with defendant and reported the incident. According to Bronaugh, at no time while she was in the 2nd District police station did anyone question defendant regarding the Diamond Clark investigation.

Sometime later defendant and Bronaugh were moved to a room in Area 1, on the second floor of the building. Defendant was not handcuffed at that time. Three detec-

tives entered the room. Defendant received *Miranda* warnings, and then the detectives left the room. Alone, defendant told Bronaugh that "his eye was hurting." The three detectives reentered the room and began questioning defendant regarding the victim's injuries. Bronaugh repeatedly advised defendant that he was not required to speak with the detectives. According to Bronaugh, this angered one of the detectives: "And he got mad at me, he was like, this bitch. I'm like, your mama a bitch." Bronaugh did not request medical treatment for defendant because they were frightened by the detectives' rude conduct. Also, Bronaugh repeatedly asked to leave the room to telephone her home because, according to her testimony: "I wanted somebody to know where I was and what was going on." The detectives told her she had to stay with defendant because he was underage. Bronaugh was allowed to leave the room and make a telephone call subsequent to defendant's inculpatory statement to Assistant State's Attorney Heil and prior to his videotaped statement. Further, according to Bronaugh, the detectives told defendant that "if he told what happened on the tape, he could go home with me."

Having heard all of the testimony, the circuit court found: "[T]he defendant's mother has borne out what the officers said. They advised defendant of his rights. He acknowledged that he understood his rights. He never requested a lawyer. His mother never requested a lawyer. She never requested medical assistance. He never requested medical assistance." The court ruled: "The statement was freely and voluntarily given and not depriving the defendant at any time of his constitutional rights. Your motion to suppress the statement is respectfully denied." Further, prior to jury selection, defendant filed a motion to reconsider the court's denial of the suppression motion. The court again recounted the evidence adduced at the hearing. The court found that neither

defendant nor his mother sought to invoke his rights or seek medical treatment for his eye injury. The court found that none of the arresting officers or the interrogating detectives were involved in the lockup incident, and that the detectives did not question defendant outside the presence of his mother. The court stated that it observed the witnesses and assessed their credibility. The court noted Bronaugh's testimony that one of the detectives cursed her, but the court observed the cool, calm, and collected demeanor of defendant and Bronaugh as defendant detailed each and every injury to the victim. The court denied the motion to reconsider, finding: "The State has proven that the statements were not the result of any physical or mental coercion illegally directed against you and they were in fact given voluntarily."

### B. Trial

At the February 2005 trial, the circuit court admitted into evidence defendant's videotaped inculpatory statement and forensic evidence. The State's evidence at trial also included the testimony of Cyntoria Clark, the victim's mother; James Franklin, an eyewitness to some of the beating; Monica Smith, the neighbor who telephoned "911"; Michael Hayes, the arresting officer; and Assistant State's Attorney Heil.

Defendant's inculpatory statement was as follows. On February 8, 2001, the victim, Diamond Clark, was 11 months old and lived with her mother, Cyntoria Clark. Defendant was 16 years old and the victim's father. That night, defendant picked up the victim for an overnight visit. He returned with the victim to the third-floor apartment where he had stayed for the past three months, located at 4837 S. St. Lawrence Avenue. In the process of giving her a bath, the victim fell in the bathtub and hit the back of her head. Defendant dried and dressed the victim and put her to bed.

Defendant awoke between 11:45 a.m. and noon on February 9. The victim was still asleep, but Dion Nelson and James Franklin, then 10 years old, were also present.[4] Defendant prepared a bowl of Fruit Loops cereal for Dion and instructed Franklin to prepare a bowl for himself. Defendant then prepared an adult-sized bowl of cereal for the victim. Initially, defendant was feeding the victim on the bed, but defendant then placed the bowl on the floor so the cereal would soften. The victim climbed down and attempted to eat pieces of cereal that had fallen onto the floor. Defendant struck the victim's hand. The victim continued to eat cereal off of the floor, so defendant bit the victim twice: once on the front shoulder and once on the back shoulder. The victim did not cry and defendant again proceeded to feed her. However, the victim again attempted to eat more pieces of cereal that fell on the floor. This time defendant bit the victim on the stomach. Defendant saw that he left three marks on the victim.

After the victim finished eating the adult-sized bowl of cereal, her stomach was "poking out," so defendant "started messing with her stomach *** started pushing on her stomach like this, trying to push it in. See how far it gonna go in." Consequently, the victim threw up, all over the bed, her clothes, and defendant's leg. Angry, defendant "karate chopped" the victim's ribs. Defendant then obtained a plastic clothes hanger and "whooped her

---

[4]Trial testimony explained that defendant resided in an apartment that belonged to Litrish Nelson, who was the sister of defendant's mother's boyfriend. Defendant, who did not attend school, lived with Nelson to babysit her three children, one of whom was three-year-old Dion. On the morning of February 9, 2001, Franklin was brought to Nelson's apartment by his mother. Franklin was to spend the day there because he had been suspended from school. Nelson and Franklin's mother left the apartment, leaving defendant, the victim, Dion, and Franklin.

on her butt four times with the hanger." After defendant "thought about it," he obtained a belt and hit the victim with that about eight times. Defendant washed the victim and dressed her in fresh clothes. However, the victim again threw up on her clothes. Defendant "was real angry." He removed the victim's jacket, left her shirt on, wiped her with a towel, and then "smacked" her hard in the face.

Defendant placed the victim in a corner and ordered her to stand facing the wall. The victim kept moving and turning to look at defendant, so he "spanked her on her pamper" about four times. Defendant then placed the victim against a wall facing him and ordered her to stand in place. When she would walk toward defendant, he would return her to the wall ordering her not to move. At one point the victim "started getting sleepy or something." She fell back against the wall, hitting her head, and bounced back on her feet. According to defendant, the victim "just started acting drunk and sleepy," and then fainted. Defendant then picked up the victim, called her name, and shook her "pretty hard," without supporting her head. While he was shaking the victim, her head hit a window casement and a windowsill. The victim stopped breathing. Defendant ran to the kitchen and threw water on the victim's face, but to no avail. He then sent Franklin to his downstairs neighbor, Monica Smith, for help. Defendant attempted CPR while Smith telephoned 911. Defendant revived the victim.

The State presented the following forensic evidence. Dr. Lawrence Cogan performed the autopsy on the victim. Dr. Cogan distinguished the marks on the victim's body related to hospital treatment from the victim's injuries that occurred prior to hospitalization. The autopsy revealed 61 injuries, both external and internal. The injuries included several bite marks on the chest and head, with some superimposed over each other, and a

probable bite mark on the shoulder. Multiple bruises and slap marks were on the head and face; the sides and top of the head had bruising, abrasions, and general swelling. There were abrasions and contusions on the lips and chin, and hemorrhages in the right eyelid and eye. Injuries further included contusions on the back of the head, parallel contusions across the face matching the imprint of a hand, and small oval contusions on the cheek, jaw, and back of the head indicative of finger impressions. Injuries further included abrasions on the right hand; a right-side rib fracture; defensive bruises on the left forearm; multiple elongated marks, quarter-inch wide, horizontal and criscrossed on the buttocks, consistent with being struck with a rod-like instrument; hemorrhage in the brain, cervical spine, diaphragm, lung, liver, and thigh. The back of the heart was bruised and the liver was torn and bleeding into the abdomen.

Dr. Cogan opined that the cause of death was multiple injuries due to assault. Dr. Cogan explained that the manner of death is classified in five categories: natural, accidental, suicide, homicide, and undetermined. Dr. Cogan classified the victim's death as homicide because her injuries were inflicted by someone and were not self-inflicted, and they did not occur naturally or accidentally.

The defense never contended that police extracted defendant's inculpatory statement through physical and mental coercion. Rather, defendant's theory of the case, as indicated by his opening statement and closing argument, was that the victim's death was a tragic accident. Defendant had no idea of the harm he was doing to the victim. In her opening statement, defense counsel merely explained to the jury that, when it viewed defendant's videotaped statement, defendant would exhibit a black eye because a police department employee assaulted him at the police station. Defendant was the sole witness for the defense. He testified that his videotaped statement

was true, except for hitting the victim with a belt, which defendant testified that he did not do. Further, during the State's cross-examination of defendant, the following colloquy occurred:

"Q. [Prosecutor] But you're saying today that you never went and got a belt and whipped her [the victim] with a belt.

A. No.

Q. So that part of the video is not true.

A. Yes.

Q. But everything else on the video is true.

A. Yes.

Q. Well, you had an opportunity at the video to say whatever you wanted, right?

A. Yes.

Q. They let you tell what happened, right? Isn't that correct?

A. Yes.

Q. You told them what happened.

A. Yeah."

Lastly, in closing argument, defense counsel argued:

"He [defendant] says to you today—he could have gotten up here and minimized and said no. The cops beat me up and I just made up that whole lie because they coerced me into saying that and you can even see this black eye but he didn't. He told you what happened and he also told you that he didn't mean for it to happen. He didn't intend for it to happen."

Defense counsel argued to the jury: "He [defendant] is telling you the truth."

At the close of the evidence, the jury returned a general verdict of guilty of first degree murder. Following a sentencing hearing, the circuit court sentenced defendant to a prison term of 40 years.

On appeal, defendant argued, *inter alia*, that the circuit court erred in denying the pretrial motion to suppress his inculpatory statement. The appellate court was not convinced that the injury defendant suffered did not

ultimately result in his inculpatory statement and, consequently, concluded that defendant's statement should have been suppressed. 376 Ill. App. 3d at 544. Viewing its conclusion as dispositive, the court held: "Defendant's conviction must be reversed and remanded for a new trial because the use of a coerced confession is never harmless error." 376 Ill. App. 3d at 544, citing *People v. Wilson*, 116 Ill. 2d 29, 41-42 (1987).

The State appeals. Additional pertinent facts will be discussed in the context of the issues raised on appeal.

## II. ANALYSIS

Before this court, the State first contends that defendant's inculpatory statement was voluntary and not coerced. The State alternatively contends that if we conclude that defendant's statement was involuntary, then its admission into evidence at trial was harmless error. We agree with the State's first contention.

### A. Controlling Principles

Review of a circuit court's ruling on a motion to suppress presents both questions of law and fact. *In re Christopher K.*, 217 Ill. 2d 348, 373 (2005); *People v. Smith*, 214 Ill. 2d 338, 347 (2005). Findings of fact and credibility determinations made by the circuit court are accorded great deference and will be reversed only if they are against the manifest weight of the evidence. *People v. Slater*, 228 Ill. 2d 137, 149 (2008); *Christopher K.*, 217 Ill. 2d at 373. This deferential standard of review is grounded in the reality that the circuit court is in a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in their testimony. *Slater*, 228 Ill. 2d at 151; *People v. Pitman*, 211 Ill. 2d 502, 512 (2004). However, a court reviews *de novo* the ultimate legal question posed by the challenge to the circuit court's ruling on the suppression motion. *Slater*, 228 Ill. 2d at 149;

*People v. Nicholas*, 218 Ill. 2d 104, 116 (2005); *In re G.O.*, 191 Ill. 2d 37, 50 (2000). Further, the reviewing court may consider evidence adduced at trial as well as at the suppression hearing. *Slater*, 228 Ill. 2d at 149; *People v. Gilliam*, 172 Ill. 2d 484, 501 (1996); *People v. King*, 109 Ill. 2d 514, 525 (1986).

The amended motion to suppress alleged that defendant's inculpatory statement was involuntary under the fifth and fourteenth amendments to the United States Constitution. The due process clause of the fourteenth amendment guarantees that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV, §1. The United States Supreme Court "has long held that certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause." *Miller v. Fenton*, 474 U.S. 104, 109, 88 L. Ed. 2d 405, 410, 106 S. Ct. 445, 449 (1985). Courts frame the legal inquiry usually through asking whether the defendant's confession was voluntary. *Miller*, 474 U.S. at 109, 88 L. Ed. 2d at 410, 106 S. Ct. at 449; *People v. Davis*, 35 Ill. 2d 202, 205 (1966) ("The constitutional test for the admission of a confession in evidence is whether the confession was made freely, voluntarily and without compulsion or inducement of any sort"). Also, the fifth amendment commands in pertinent part that no person shall be compelled in any criminal case to be a witness against himself or herself. U.S. Const., amend. V. The fifth amendment's self-incrimination clause applies to the states through the due process clause of the fourteenth amendment. *Malloy v. Hogan*, 378 U.S. 1, 6, 12 L. Ed. 2d 653, 658, 84 S. Ct. 1489, 1492 (1964). However, the Court continues to measure confessions against the requirements of due process and to exclude involuntary confessions. *Dicker-*

*son v. United States*, 530 U.S. 428, 434, 147 L. Ed. 2d 405, 413, 120 S. Ct. 2326, 2331 (2000); *Miller*, 474 U.S. at 110, 88 L. Ed. 2d at 410, 106 S. Ct. at 449.

The "Court's decisions reflect a frank recognition that the Constitution requires the sacrifice of neither security nor liberty. The Due Process Clause does not mandate that the police forgo all questioning, or that they be given carte blanche to extract what they can from a suspect." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225, 36 L. Ed. 2d 854, 861-62, 93 S. Ct. 2041, 2047 (1973). Rather:

> " 'The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.' " *Schneckloth*, 412 U.S. at 225-26, 36 L. Ed. 2d at 862, 93 S. Ct. at 2047, quoting *Culombe v. Connecticut*, 367 U.S. 568, 602, 6 L. Ed. 2d 1037, 1057-58, 81 S. Ct. 1860, 1879 (1961).

This court has likewise stated: "The test of voluntariness is 'whether the defendant made the statement freely, voluntarily, and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he or she confessed.' " *Slater*, 228 Ill. 2d at 160, quoting *Gilliam*, 172 Ill. 2d at 500; see *G.O.*, 191 Ill. 2d at 54.

In determining whether a statement is voluntary, a court must consider the totality of the circumstances of the particular case; no single factor is dispositive. Factors to consider include the defendant's age, intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning; the legality and duration of the detention; the presence of *Miranda* warnings; the duration of the questioning; and any physi-

cal or mental abuse by police, including the existence of threats or promises. *Slater*, 228 Ill. 2d at 160; *Gilliam*, 172 Ill. 2d at 500-01; *People v. Melock*, 149 Ill. 2d 423, 447-48 (1992); accord *Schneckloth*, 412 U.S. at 226, 36 L. Ed. 2d at 862, 93 S. Ct. at 2047.

Also, where the defendant is a juvenile, the greatest care must be taken to assure that the statement was not coerced or suggested, and that the statement was not the result of ignorance of rights or of adolescent fantasy, fright, or despair. *G.O.*, 191 Ill. 2d at 54 (and cases cited therein). Therefore the determination of voluntariness must include the "concerned adult" factor, which considers whether the juvenile, either before or during the interrogation, had an opportunity to consult with an adult interested in the juvenile's welfare. This factor also considers whether the police prevented the juvenile from conferring with a concerned adult and whether the police frustrated the parents' attempt to confer with the juvenile. *G.O.*, 191 Ill. 2d at 54-55.

Where a defendant challenges the admissibility of an inculpatory statement through a motion to suppress, the State bears the burden of proving, by a preponderance of the evidence, that the statement was voluntary. 725 ILCS 5/114—11(d) (West 2000); *Slater*, 228 Ill. 2d at 160; *Wilson*, 116 Ill. 2d at 38; *King*, 109 Ill. 2d at 525. The State carries the initial burden of making a *prima facie* case that the statement was voluntary. Once the State makes its *prima facie* case, the burden shifts to the defense to produce some evidence that the confession was involuntary (*People v. Patterson*, 154 Ill. 2d 414, 445 (1992)), and the burden reverts to the State only upon such production by the defense. See *People v. Lopez*, 114 Ill. App. 3d 1018, 1024 (1983) (and cases cited therein); *People v. Slaughter*, 59 Ill. App. 3d 159, 161 (1978). However: "This court has held that when it is evident that a defendant has been injured while in police custody,

the State must show, by clear and convincing evidence, that the injuries were not inflicted as a means of producing the confession." *Wilson*, 116 Ill. 2d at 40 (collecting cases). In *People v. La Frana*, 4 Ill. 2d 261, 267 (1954), this court explained:

> "Where the only evidence of coercion is the defendant's own testimony, and where this is contradicted by witnesses for the People, then of course the trial court may choose to believe the latter, and our recognition of the superior position of the trial court to evaluate the credibility of the witnesses before it makes us reluctant to reverse its determination. [Citations.] But where it is conceded, or clearly established, that the defendant received injuries while in police custody, and the only issue is how and why they were inflicted, we have held that something more than a mere denial by the police of coercion is required. Under such circumstances the burden of establishing that the injuries were not administered in order to obtain the confession, can be met only by clear and convincing testimony as to the manner of their occurrence."

Accord *People v. Thomlison*, 400 Ill. 555, 561-62 (1948). Also, where it is established or conceded that the defendant's injury occurred while in police custody, the focus is not on the credibility of the defendant's account of the injury, but rather on "whether the State satisfied its burden to establish by clear and convincing evidence that defendant's injuries were not inflicted as a means of producing defendant's confession." *People v. Woods*, 184 Ill. 2d 130, 149 (1998).

Pursuant to the *"Wilson"* rule,[5] the clear and convincing standard applies to factual situations where it is established or conceded that the defendant was assaulted after coming into police custody, but the sole witnesses to the custody, usually police officers, deny any

---

[5]*Wilson* did not create this long-standing rule, but merely applied it. This heightened burden of proof could be labeled the *"Wilson/La Frana/Thomlison"* rule.

knowledge of how the defendant was injured. Under the preponderance of the evidence standard, such passive denials could allow the State to prevail without establishing the actual circumstances surrounding the confession. The *Wilson* rule deems the preponderance standard to be inadequate and replaces it with the clear and convincing evidence standard. See *People v. Case*, 218 Ill. App. 3d 146, 155 (1991). It must be remembered that a standard of proof is concerned only with the quantum and quality of evidence that a party must present to prevail on an issue. *In re D.T.*, 212 Ill. 2d 347, 355 (2004). Ultimately, the constitutional test for the admission of a confession into evidence remains whether the confession was voluntary. See *Culombe*, 367 U.S. at 602, 6 L. Ed. 2d at 1057-58, 81 S. Ct. at 1879; *Davis*, 35 Ill. 2d at 205.

### B. Application: Defendant's Eye Injury

In the present case, absent defendant's black eye, the State would have been required to prove the voluntariness of defendant's inculpatory statement by a preponderance of the evidence. Where the only evidence of coercion would have been Bronaugh's testimony, which was contradicted by the State's witnesses, the circuit court would have been presented solely with an issue of witness credibility, and a reviewing court would have been reluctant to reverse such a determination. However, because it is undisputed that defendant was injured in police custody, the State was required to prove by clear and convincing evidence that defendant's eye injury was not inflicted as a means of producing his inculpatory statement. For example: "*If the defendant were injured in the lock up, the State could have one of its officers testify to that effect.*" (Emphasis added.) *People v. Smith*, 197 Ill. App. 3d 226, 231 (1989). Unlike *Smith*, where the State "did not produce any evidence of how defendant was injured" (*Smith*, 197 Ill. App. 3d at 231), in the

present case, this is exactly how defendant was injured and the State proved it by undisputed evidence.

At the suppression hearing, Nolan, Zalatoris, and O'Connell did not merely deny defendant's allegations that *they* assaulted him, or deny any knowledge of how defendant was injured. The State's clear and convincing burden of proof required " 'more than the mere denial by the State's witnesses that the confession was coerced.' " *Woods*, 184 Ill. 2d at 146, quoting *Wilson*, 116 Ill. 2d at 40; see *Smith*, 197 Ill. App. 3d at 231. Rather, the State's witnesses related defendant's accusation that the *lockup keeper* assaulted him. With only Heil, defendant, and Bronaugh in the interview room, defendant stated that his eye injury occurred in the police station lockup, and that he had been "treated fine" at Area 1. Defendant told Heil that his statement was the truth and had nothing to do with his eye injury. Bronaugh testified that defendant complained of a uniformed guard injuring him in the police station lockup, rather than Area 1 detectives. Also, at the beginning of his videotaped statement, defendant himself explained that: his eye injury occurred in the police station lockup; no Area 1 detective inflicted the injury; and his statement was unrelated to his eye injury.

In concluding that the State failed to meet its burden of proving that defendant's injury was unrelated to his inculpatory statement, the appellate court considered the facts of *People v. Woods* to be similar to the facts of this case. 376 Ill. App. 3d at 543. In *Woods*, it was undisputed that the defendant sustained injuries to his face while in police custody. Also, during that time, the defendant was either in the presence of police officers or in a single-person holding cell. The defendant moved to suppress his confession contending that it was involuntary. This court concluded that the State should have been able to prove the cause of the defendant's injuries and whether they occurred before or after his confession. This court held

that the confession should have been suppressed because the State failed to adduce clear and convincing evidence as to when or how the defendant was injured, or that the defendant's injuries were unrelated to his confession. *Woods*, 184 Ill. 2d at 149-50.

*Woods* is distinguishable from this case. The record before us contains clear and convincing evidence, including defendant's own testimony, that establishes that defendant's inculpatory statement was unrelated to his injury. Further, *Woods* explicitly rejects a *per se* rule that any unexplained injury suffered by a defendant in police custody renders the defendant's statement inadmissible. *Woods*, 184 Ill. 2d at 147. This court has recognized that the taint of earlier coercive circumstances can be attenuated, thereby rendering a subsequent statement voluntary. See *People v. Strickland*, 129 Ill. 2d 550, 557 (1989) (collecting cases). In *Woods*, this court adhered to our past decisions holding that where a defendant establishes that he has been injured while in police custody, the State may present "clear and convincing evidence that 'the injuries were not inflicted as a means of producing the confession.' *Wilson*, 116 Ill. 2d at 40." *Woods*, 184 Ill. 2d at 147-48.

Our admonition in *Woods* reflects the general understanding that "[a] confession is not rendered inadmissible as a matter of law because of an assault upon the defendant which occurred prior to, disconnected with, and apparently unrelated to the subsequent confession." *Barton v. State*, 605 S.W.2d 605, 607 (Tex. Crim. App. 1980); accord *Leon v. State*, 410 So. 2d 201, 203 (Fla. App. 1982) (collecting cases). Although physical force is certainly a defining circumstance, and possibly a dispositive one, its incidental use can sometimes be excused where the other circumstances surrounding the interview show a voluntary confession. The relevant inquiry is the totality of the circumstances. See *United States v. Upton*,

512 F.3d 394, 399 (7th Cir. 2008). Courts look to factors such as gaps in time between the use of force and the confession, changed interrogators or location, and renewed *Miranda* warnings. See, *e.g.*, *Upton*, 512 F.3d at 399; *Wilson v. O'Leary*, 895 F.2d 378, 384-85 (7th Cir. 1990); *State v. Gella*, 92 Haw. 135, 143-45, 988 P.2d 200, 208-10 (1999); *People v. Wells*, 238 Mich. App. 383, 389, 605 N.W.2d 374, 378 (1999); *Burch v. State*, 346 Md. 253, 261-68, 696 A.2d 443, 447-51 (1997).

In the present case, our review of the entire record supports the circuit court's finding of voluntariness. Defendant arrived at the 2nd District police station at 3:35 p.m. on February 9, 2001. Between 5 and 5:30 p.m., defendant received a black eye in the police station lockup from someone who did not receive defendant's statement. Although Youth Investigator Nolan saw defendant prior to his injury, Nolan did not question defendant regarding the investigation at that time. Further, defendant was already injured when Detectives Zalatoris and O'Connell first met defendant and his mother.

Also, defendant was interviewed at Area 1, which was a different location from where he was injured. Nolan, Zalatoris, and O'Connell first interviewed defendant at 9:08 p.m., which was between 3½ and 4 hours after the injury. This interview lasted only between 45 minutes and one hour. At approximately 12:30 a.m. on February 10, defendant repeated his inculpatory statement to Assistant State's Attorney Heil, Nolan, and O'Connell in a session lasting only between 30 and 45 minutes. At approximately 9:27 a.m., defendant made a videotaped statement. Significantly, defendant's statement was taken in the presence of his mother and Youth Investigator Nolan. Further, according to Bronaugh's testimony, she repeatedly told defendant that he did not have to speak to the detectives.

At every opportunity to speak, defendant repeatedly: identified his assailant as the lockup keeper, rather than the detectives as alleged in the amended motion to suppress; and asserted that his black eye had nothing to do with his statement. Further, defendant never indicated that he gave his statement because of the fact of being hit, or any fear based on being hit. Defendant repeatedly acknowledged that Area 1 detectives provided him with food and drink, restroom access when needed, and time to sleep. See, *e.g.*, *People v. Moats*, 89 Ill. App. 3d 194, 198-200 (1980) (upholding denial of motion to suppress inculpatory statements; observing that defendant's admission that injury was not result of police brutality can be "key evidence" supporting State's explanation for injury). Indeed, at defendant's first interview, which occurred after the incident in the lockup, defendant initially did not admit culpability. It was only after being confronted with the victim's bruises and bite marks did defendant give his inculpatory statement, which supports the conclusion that the incident in the lockup was unrelated to the inculpatory statement. See *People v. Williams*, 128 Ill. App. 3d 384, 392 (1984) (noting that "manner in which a defendant answers questions can also be a factor in the totality of the circumstances test"). The circuit court found that defendant and his mother appeared "cool, calm, and collected" throughout his videotaped statement as defendant detailed the injuries he inflicted on the victim. Further, our own review of defendant's videotaped statement confirms this credibility finding. See *Slater*, 228 Ill. 2d at 160 (failing to discern from videotaped statement outward indication that defendant has mental disability).

Lastly, at trial, defendant could have recanted the voluntariness of his inculpatory statement, as he recanted a minor factual detail in the statement, but he did not. Indeed, during his trial testimony, defendant expressly

conceded that his inculpatory statement was voluntary. See, *e.g.*, *King*, 109 Ill. 2d at 525 (observing that on review of circuit court's suppression ruling reviewing court may consider evidence adduced at trial as well as at suppression hearing).

We note that the appellate court, in contrast, concluded that "the State failed to meet its burden to show that defendant's injuries were unrelated to his confession. *** There simply was no evidence presented by the State at the hearing on the motion that explained how or why defendant was injured in police custody." 376 Ill. App. 3d at 543. We disagree, based on the above-discussed uncontradicted evidence in the entire record.

Noting that defendant told Nolan, Zalatoris, and O'Connell that a lockup keeper punched him in the face, the appellate court opined: "Not one of them attempted to elicit additional information from defendant regarding his injury, nor did any notation of the injury appear in any reports." 376 Ill. App. 3d at 543. However, this was not necessary for the State to meet its dual burden of going forward with the evidence and proving the inculpatory statement voluntary. It was necessary only for the prosecution to make a *prima facie* case before defendant was required to present some evidence. See *Patterson*, 154 Ill. 2d at 445; *People v. Strayhorn*, 35 Ill. 2d 41, 46 (1965). That said, we observe that while defendant was being interviewed, the Office of Professional Standards was investigating the lockup incident. The detectives did not document defendant's eye injury because: Professional Standards was doing so; and, by defendant's own accusation, the incident involved 2nd District personnel and not Area 1 personnel. Indeed, early in the suppression hearing, defense counsel received a copy of the Professional Standards file.[6]

---

[6]Perhaps the Professional Standards file prompted the follow-

Further, we note that the appellate court improperly rejected defendant's own testimony that the lockup incident was unrelated to his inculpatory statement:

"Assuming that defendant was injured while in the lockup, here, we have a somewhat unintelligent, unsophisticated juvenile who has been injured while in police custody after being arrested on suspicion of murder. After being arrested, defendant was not free to leave and was therefore at the mercy of the police personnel involved in this case. We are not convinced that, *given the facts of this case*, defendant would be able to separate the fear associated with being punched by police personnel from any subsequent interactions with police officers or detectives involved in this case. In addition, it is particularly troubling that personnel from the Office of Professional Standards were prevented from speaking with defendant regarding his injury until after defendant gave the videotaped statement. Consequently, we are not convinced that the injury defendant suffered did not ultimately result in the statement wherein he inculpated himself in the death of his daughter." (Emphasis in original.) 376 Ill. App. 3d at 543-44.

This reasoning does not accord with the record.

First, defendant was *not* "arrested on suspicion of murder." Defendant arrived at the 2nd District police station on February 9, 2001, at 3:35 p.m. He was under arrest for child abuse or aggravated battery of a child. The appellate court itself so recognized. 376 Ill. App. 3d at 539 n.1. When defendant was questioned beginning at 9:08 p.m., the victim was still alive. Heil had already been summoned to receive defendant's inculpatory statement when the victim died at 11:45 p.m.

Second, defendant presented no evidence of residual

---

ing colloquy at the suppression hearing during defense counsel's cross-examination of Nolan:

"Q. Are you aware that the complaint against the detention aid or the lockup keeper aid was sustained?
[Prosecutor]: Objection.
THE COURT: Sustained."

fear resulting from the lockup incident. Further, if defendant did harbor such residual fear, the record shows that it was dispelled by the 9:08 p.m. interview. There, defendant did not behave as if his will was overborne due to residual fear. Rather, defendant initially denied his culpability until he was confronted with the victim's bruises and bite marks.

Third, the appellate court vaguely characterized defendant as "a somewhat unintelligent, unsophisticated juvenile." Also, before this court, defendant's brief opens with a fleeting reference to defendant as "mentally retarded." A defendant's youth and subnormal intelligence do not *ipso facto* render the defendant's confession involuntary. *People v. Hester*, 39 Ill. 2d 489, 497-502 (1968). While mental deficiency, by itself, does not render an inculpatory statement involuntary, it is a factor that must be considered in the totality of the circumstances under which the defendant waived *Miranda* rights or made an inculpatory statement. *People v. Turner*, 56 Ill. 2d 201, 206 (1973).

In the present case, prior to filing a motion to suppress, the defense retained a private expert to examine defendant "as to his ability to waive Miranda and some psychological issues." At the suppression hearing, once the State made its *prima facie* case of voluntariness, defendant was required to present some evidence on this issue. See, *e.g.*, *Lopez*, 114 Ill. App. 3d at 1024; *Slaughter*, 59 Ill. App. 3d at 161. However, at the suppression hearing, defendant presented no evidence or argument of any mental deficiency that would render his inculpatory statement involuntary, and the circuit court made no findings relating thereto.[7]

Further, the constant presence of defendant's mother

---

[7]Indeed, the issue of defendant's mental capacity was not raised until sentencing.

and Youth Investigator Nolan cannot be overlooked. The ability to confer with a parent or other concerned adult is a relevant factor to consider in determining the voluntariness of a juvenile's statement. *G.O.*, 191 Ill. 2d at 55. In the present case, Bronaugh was with defendant from shortly after the lockup incident between 5 and 5:30 p.m. on February 9. Indeed, Bronaugh complained that the detectives did not allow her to telephone her family to inform them where she was. However, the detectives explained to her that she had to stay with defendant because he was a juvenile. Bronaugh did not leave defendant until he gave his inculpatory statement to Heil in the early morning of February 10. See, *e.g.*, *Reid*, 136 Ill. 2d at 59 (noting presence of defendant's mother during questioning as circumstance in favor of upholding finding of voluntariness). On this record, we conclude that defendant's youth and mental capacity did not render his inculpatory statement involuntary.

Defendant specifically alleged that the detectives physically assaulted him in order to extract his inculpatory statement. However, absent defendant's undisputed eye injury, none of the evidence of record, even testimony presented by the defense, supports this allegation. "Just as a court may not ignore a defendant's uncontroverted testimony that a confession was a product of specific acts of physical or mental coercion, so it may not ignore uncontroverted testimony by the State establishing the voluntariness of a confession." *Lopez*, 114 Ill. App. 3d at 1024. We conclude that the State proved by clear and convincing evidence the manner of defendant's eye injury, thereby establishing that the injury was not inflicted to obtain his inculpatory statement.

### C. Defendant's Remaining Allegations

The amended motion to suppress additionally alleged that the detectives repeatedly: cursed and shouted at

defendant's mother and "told her to shut up"; told defendant that "he would be raped in prison"; and told defendant that "if he made a statement, he would go home." The motion also alleged that "several members of the police department approached him and told him that he would never go home." However, in their testimony, Nolan, Zalatoris, and O'Connell each denied that he, or anyone in his presence, committed the alleged acts. In denying the motion to suppress, the circuit court expressly assessed the credibility of the witnesses. Regarding the alleged invective hurled at Bronaugh, her own testimony plainly shows that, rather than being cowed, she simply returned the epithet to the detective. The circuit court specifically found that in defendant's videotaped statement Bronaugh appeared cool, calm, collected, and not in the least bit agitated.

After reviewing the entire record, we conclude that there is no evidence that defendant's will was overborne. In rejecting the allegations of the amended motion to suppress, the circuit court plainly found the State's witnesses to be more credible. As stated, findings of fact and credibility determinations made by the circuit court are accorded great deference because that court is in the best position to observe the conduct and demeanor of the parties and witnesses, to assess their credibility, and to give the appropriate weight to the evidence. *Slater*, 228 Ill. 2d at 151. Based on the totality of the circumstances, we agree with the circuit court that defendant's inculpatory statement was voluntary, and we uphold the circuit court's denial of defendant's motion to suppress his inculpatory statement. Consequently, we decline the State's invitation to discuss whether the admission of defendant's statement into evidence at trial was harmless error. See, *e.g.*, *People v. Garvin*, 219 Ill. 2d 104, 116 (2006) (declining to consider whether admission of the defendant's statements into evidence at trial was harm-

less error because trial court properly admitted them); *Patterson*, 154 Ill. 2d at 447 (same); *Case*, 218 Ill. App. 3d at 159 (same); accord *People v. Brown*, 229 Ill. 2d 374, 392 (2008) (finding no error, "we need not consider the State's harmless-error argument").

Further, the appellate court did not address all of the issues raised by defendant on appeal because it considered the suppression issue dispositive. 376 Ill. App. 3d at 544. Therefore, we remand the cause to the appellate court for consideration of defendant's remaining contentions. See, *e.g.*, *People v. Collins*, 214 Ill. 2d 206, 222 (2005); *People v. Rosenberg*, 213 Ill. 2d 69, 82 (2004).

### III. CONCLUSION

For the foregoing reasons, the judgment of the appellate court is reversed, and the cause remanded to the appellate court for further proceedings.

*Reversed and remanded.*