2021 IL App (2d) 191083-U
No. 2-19-1083
Order filed October 12, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CM-2105 |
| SALVADOR M. SILVA, | ) ) | Honorable Brian W. Jacobs, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Presiding Justice Bridges and Justice McLaren concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Sufficient evidence supported conviction of battery, and defendant's statements to police after previous invocation of right to counsel were made voluntarily, knowingly, and intelligently.

¶ 2    The defendant, Salvador M. Silva, was convicted by a jury of battery and theft, and was sentenced to two years' probation. He appeals, arguing that there was insufficient evidence that he knowingly made contact of an insulting or provoking nature to support his conviction of battery, and that the trial court erred in denying his motion to suppress his statements to police. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4    The evidence at trial was as follows. About 5:45 on the afternoon of September 30, 2018, Christy Larson was in Northside Park, taking photos and videos for a project. A little after 6 p.m., she noticed Silva staring at her. She ignored him and continued taking videos. When she looked up and saw that he had moved closer, she turned her back to indicate that she did not want to interact with him. However, when she turned around again he had moved even closer. Silva, whom she did not know, said hello to her. She briefly said hi and then turned her back again.

¶ 5    When Larson had finished taking her video, Silva introduced himself and struck up a conversation with her. Silva asked if she was married and Larsen said yes, and then asked if Silva was single. They talked about where Silva lived in relation to the park. Silva then asked her several times to squat down, placing his hands on her shoulders and pushing down lightly. Larson was very surprised. She did not comply and said no. From behind her, Silva then began rubbing her thighs and placed his hands on her back under her shirt. Larson stepped away. Silva said something like "it's hard to want something and not be able to get it." Larson decided to leave and began walking toward the sidewalk.

¶ 6    Silva followed her and began talking about photography again. Once they reached the sidewalk, Larson asked if he wanted to take a selfie with her, thinking that would placate him and would also give her evidence if she needed it. She took a selfie of them both with her phone. She did not use her phone to call the police because she had never done that before and it seemed like an extreme measure. Although she felt uncomfortable and concerned, she did not think she was in physical danger. She could smell alcohol on Silva's breath and thought he was drunk.

¶ 7    Silva then began talking to Larson in an explicitly sexual way, telling her that even though she was married she could still have sex with him and asking her if she wanted to have sex with him. Larson told him no. Larson began thinking about how to get away from Silva. She was

worried that, if she simply went home, Silva would follow her and learn where she and her family lived. From the time Silva had begun talking to her, there had not been anyone else nearby. After trying to think what to do, Larson thought that perhaps she could walk him to his house and leave him there. She began walking toward the side of the park near where Silva had said he lived. As they walked, Silva put his arm around her. Larson was uncomfortable but, viewing him as simply very drunk, did not feel particularly threatened. After they passed a more well-traveled part of the park near the pool, Silva began talking about sex again. Silva put his hand near Larson's bra, and she quickly pushed it away and said no. To stop Silva from trying to touch her sexually, she took his hand and moved it to her shoulder, holding it there. Silva then put his other hand between her legs and asked her if she wanted him to lick her pussy. Larson moved his hand and said no. Silva licked her hand.

¶ 8    Larson continued saying no to Silva's propositions. As a "soft letdown," Larson complimented Silva, telling him that he was handsome and fit but they were not going to have sex. Larson was uncomfortable but not scared, and it did not cross her mind to try to run away. They passed someone walking some dogs and Larson thought about asking that person for help, but she did not because Silva had not tried to use any force and did not seem threatening, and she still felt that the situation was under control. Larson was also trying to appease Silva, as she did not want him to become angry.

¶ 9    As they approached a more isolated area, Silva began to veer off the sidewalk, pointing to the grass and saying "right here." Larson became concerned, realizing that Silva was "a little bit more set" on his desire than she had expected. She told him that they were not going into that area and turned away from him. She then told him that she was going to leave and that he needed to stay there.

¶ 10    As she began to walk away, Silva confronted her, expressing concern that she had his picture on her phone. Larson noticed a jogger passing by and tried to follow him. She did not call out as she still hoped that Silva would simply allow her to leave and she did not want to make a scene. However, she could not keep up with the jogger. Silva then came up to her, put his arm around her shoulder and tried to steer her toward the grass. Larson became more alarmed and said that she was going to call her husband. Silva repeatedly said "don't call," and tried to get the phone from her. Before Larson was able to call her husband, Silva took her phone and put it in his pocket. Larson demanded that he give it back and tried to grab it from him. They grappled in a circle as she tried to get her phone and he prevented her from doing so. When she reached into his pocket to try to get her phone, some white powder fell out on his shoe. She asked him what it was, and Silva's demeanor changed. He broke off and began running away. Wanting her phone back, Larson initially chased him, but she could not catch him and abandoned the chase after he cut through a marshy area. Larson then flagged down a passer-by and used his phone to call the police.

¶ 11    After the police arrived and she explained what had happened, they became concerned and began treating the incident as more than simply a stolen phone. They insisted that she wait until an ambulance arrived and she was checked over. After that, they drove her to an apartment complex and asked if she recognized a man being detained. She was not sure at first; Silva had changed clothes from the park. Once she heard him speak, however, she was more certain. She then accompanied the police to the station and gave written and video statements. That process took a few hours, and it was after 11 p.m. when she got home. The police had found her phone. She told them that there was a picture of Silva on the phone, and they downloaded it. Larson identified the photo at trial and it was admitted into evidence.

¶ 12    On cross-examination, Larson conceded that she did not initially mention the photo in her statements to police, and did not tell them why she took it.  During the interviews, she had told the police that she complimented Silva by telling him that he was "strong, sexy and cute," while still telling him no.  She agreed that she did think he was cute.  She did not understand the process of pressing charges, and asked the police whether it was "criminal charges or nothing."  She believed that Silva's purpose in taking her phone was not to steal it, but because he was uncomfortable with having his picture on it.  Larson testified that she was smiling in the selfie photo, and that she once laughed at one of Silva's propositions, because laughter and smiling were a defense mechanism for her.

¶ 13    Wheaton police officer Roberto Miraballi testified that, at about 6:30 in the evening, he was dispatched to Northside Park to investigate a complaint of a stolen cell phone.  He and the other responding officers spoke with Larsen about what had happened.  When they realized that the perpetrator had attempted sexual contact with Larsen, they called in more officers.  The police began searching the area as Larsen was being medically cleared by the ambulance crew.  They located Larsen's phone in a trash can along the path.  Other officers located someone they believed might be the suspect in the laundry room of a building near the park.  Both Larsen and the suspect were eventually brought to the police station for interviews.

¶ 14    Miraballi took part in the interview of the suspect, whom he identified in court as Silva.  Silva was placed in a locked interview room shortly before 9 p.m.  He initially had his cell phone with him and placed a call.  The interview did not start until around 11:30 p.m.  Asked how he was doing, Silva said that he was not doing well because something had happened in the park.  He then said that he was coming from eating dinner in Carol Stream when the police found him, before admitting that he had been in the park.  He saw a beautiful woman in the park and approached her

but "was not trying to touch her." Silva then said that he did hug her at some point. He described a confrontation with Larsen in which she pushed and punched him, and attempted to kick him in the groin. He took her phone because she had a picture of him that he did not want her to have. At no point did Silva say that he was having any trouble understanding the officers.

¶ 15    Wheaton police officer Brian Wagner testified that, when he began his shift at 7 p.m. on September 30, 2018, he was assigned to assist searching for the suspect near Northside Park. After another officer located a suspect in the laundry room of an apartment complex adjacent to the park, Wagner went there also. He identified the suspect in court as Silva. Silva appeared to be drunk, with glassy eyes, slurred speech, and an odor of alcohol on his breath. Wagner asked Silva what he had been doing earlier in the day, and Silva gave several conflicting stories, first denying being in the park, then admitting it, then denying it again. Silva also gave conflicting stories about the amount of alcohol he had consumed. After receiving Silva's consent to do so, Wagner collected the clothing from the two washing machines that Silva had been loading, including a pair of jeans that was heavily soiled with dirt and plant material. Larsen was then brought to the scene to see if she identified Silva as the perpetrator. When Larsen arrived, Silva became nervous and fidgety, spontaneously repeating that he "didn't do it" and that people got him confused a lot, as there were a lot of "Domingos."

¶ 16    The sole witness called by the defense was police detective Jackie Johnson, who participated in interviewing Silva and Larsen at the police station. During her interview of Larsen, she showed Larsen a printout of a map of the park, and Larsen marked on the map the areas of the park where she interacted with Silva. Johnson did not preserve the map as evidence.

¶ 17    In closing, the defense argued that Larsen's conduct was ambiguous and that Silva, who was drunk, simply misunderstood whether she welcomed his advances. The State noted that

Larsen repeatedly said no to Silva's propositions and she physically removed his hands when he touched her, and argued that "no means no." After deliberating, the jury found Silva guilty of battery and theft, and not guilty of disorderly conduct.

¶ 18     At the sentencing hearing, the State noted that Larsen had expressed that she did not want to file a victim impact statement and did not want Silva to receive jail time. The State asked that Silva complete sex offender probation. The defense opposed this, again arguing that the situation had simply been a misunderstanding, not a crime. The trial court sentenced Silva to two years of ordinary probation, saying that it believed "that the defendant was intoxicated at this time, and also *** that the unusual behavior of the complaining witness in this case could have led an intoxicated person to believe that the complaining witness was in some way interested in the defendant." However, the trial court also noted that the jury had weighed this argument and found Silva guilty of both battery and theft.

¶ 19                    II. ANALYSIS

¶ 20     Silva now appeals, arguing that (1) there was insufficient evidence that he knowingly made insulting or provoking contact with Larson, given her ambiguous statements and conduct, and (2) the trial court erred in denying his motion to suppress his statements to the police.

¶ 21                    A. Sufficiency of the Evidence

¶ 22     To sustain Silva's battery conviction, the State was required to prove beyond a reasonable doubt that he knowingly made physical contact of an insulting or provoking nature with Larsen. See 720 ILCS 5/12-3(a)(2) (West 2016). Silva argues that the State did not prove that he knowingly made insulting or provoking contact with Larson, given her ambiguous statements and conduct.

¶ 23     In evaluating the sufficiency of the evidence, it is not the province of this court to retry the defendant. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). The relevant question is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The weight to be given to the witnesses' testimony, the determination of their credibility, and the reasonable inferences to be drawn from the evidence are all matters within the jurisdiction of the trier of fact. *People v. Smith*, 185 Ill. 2d 532, 542 (1999); *Collins*, 106 Ill. 2d at 261-62. Likewise, the resolution of any conflicts or inconsistencies in the evidence is also within the province of the fact finder. *Collins*, 106 Ill. 2d at 261-62. We will set aside a criminal conviction only "where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt." *Smith*, 185 Ill. 2d at 542.

¶ 24     Silva argues that the evidence failed to show beyond a reasonable doubt either that his touching of Larsen was in fact insulting or provoking to her, or that he knew that it was, because his conduct did not cause her to scream or call the police, and Larsen's compliments made him think that she liked him. However, the evidence also showed that Larsen repeatedly told Silva no in response to his advances and physically resisted his attempts to touch her sexually. She thus demonstrated that his sexual touching of her was objectionable and communicated that fact to him.

¶ 25     It is the job of the jury to resolve any conflicts or inconsistencies in the evidence (*Collins*, 106 Ill. 2d at 261-62), and here the jury did just that. A rational juror could well find, on the evidence presented, that Silva knew his sexual touching of Larsen was unwelcome and simply chose to ignore Larsen's communication of the boundaries on the behavior she would tolerate. We therefore reject Silva's argument regarding the sufficiency of the evidence.

¶ 26                          B. Denial of the Motion to Suppress

¶ 27    We now turn to Silva's argument that the trial court erred in denying his motion to suppress statements he made to police on the night of the incident. We begin by recounting the relevant facts.

¶ 28    Prior to the trial in this case, Silva moved to suppress his statements made after being taken into custody, arguing that they were made after he had indicated a desire to be represented by counsel, but the police improperly continued to interrogate him. At the parties' request, the trial court viewed a video recording of the entire time that Silva spent in the interview room, a roughly three-and-a-half-hour period that included a little over 30 minutes of actual interrogation. The motion also stated that Silva was in a cell alone before being moved to the interview room.

¶ 29    The video showed that Silva was brought to the interview room at about 8:42 p.m. Silva asked for coffee, and an officer brought him some. The officer then asked Silva to remove his belt, shoes, hat, and chain. Silva asked what happened, and the officer told him that he was being placed in custody for an incident that happened earlier that night. The officer left with Silva's clothing items. Silva drank his coffee.

¶ 30    About 9:36, Silva asked for more coffee. An officer told him that they were out of coffee and would have to make more. Silva asked when they would talk with him and was told "soon." The officer left and Silva pulled out his cell phone, which the police had not taken from him. He placed a call. He gave his name and said that he would like a lawyer, then hung up. An officer entered the interview room and asked if Silva had his phone. Silva said yes, and that he had already called his lawyer. The officer told him that they needed to take his phone. Silva said that he needed to talk with his lawyer. The officer took the phone and left the room. About a minute later, Detective Johnson entered the room and told Silva that they would speak with him soon.

Silva told her that he had work the next morning and had already called his lawyer. Johnson left the room. Silva then asked to use bathroom and was allowed to do so. As part of that process, his pockets were searched, yielding only quarters for the laundry. The police left the interview room again about 9:50 p.m.

¶ 31    Almost an hour later, at 10:44 p.m., Silva banged on the door of the interview room and asked when they were going to come talk with him. At 11:23 p.m., Johnson reentered the room and asked Silva if he wanted more coffee. Silva said yes, commented that the room was cold, and said that he did not know what was going on, "but anyway I'll help you." Johnson told him she would be back after the coffee was brewed.

¶ 32    A few minutes later, Johnson reentered with a cup of coffee for Silva. When she asked if he was okay, he responded with a burst of speech, saying that he was fine, he was only worried because he was doing laundry when the police arrived and told him that something happened in the park, but he did not know what happened. Johnson told him that everything was being recorded and pointed to the cameras, and Silva said, "yes, right." Miraballi joined them in the interview room. Johnson said that before they got started, she wanted to get some "basic information" from him, and Silva said, "I will answer you."

¶ 33    Silva gave his name, date of birth, address, employment, and education in response to questions. When he began to talk about the events of the evening, Johnson stopped him from doing so. She then read him his *Miranda* rights and asked if he understood them. Silva said yes. He asked what was going on and said that he had called an attorney. Johnson immediately asked Silva whether he wanted to speak with her, and Silva said yes. He said that he would help them and asked what was going on.

¶ 34    Silva told them that he had been at work, had come home and gone for a walk in the park, and then began doing laundry.  When asked to say more about his walk in the park, Silva at first said that he did not want to talk about his "private life," but then agreed to talk to Johnson about that.  Asked to describe his interaction with "a girl in the park," Silva said no.  Miraballi pressed him, saying that Silva could already be charged with several crimes just based on the information they already had, but this was his opportunity to tell his side of the story.  Silva then talked about the incident.  After a minute, Silva asked for someone who could speak Spanish.  Miraballi told him that no one was available right then.  Silva continued talking.

¶ 35    After a few minutes, Silva said that now it was "too late," and said that if he had to "pay for it" to please send him a lawyer.  Noting that Silva had talked about calling a lawyer or said that he had done so, Miraballi said that he needed to know whether Silva wanted to continue speaking with them.  Silva said yes.  Johnson emphasized that if Silva ever wanted to stop talking or get a lawyer he could just tell them so.

¶ 36    Silva agreed to do so and continued talking about the incident.  However, a few minutes later, he said, "I need a lawyer first."  Johnson asked Silva if he wanted a lawyer right then.  Silva said yes.  However, he then continued talking—in fact, both officers tried to get him to stop talking and clarify his comments about a lawyer but he continued talking over them and would not stop.  At 11:59 p.m., Johnson asked if Silva meant that he wanted a lawyer after he finished speaking with them; Silva again said yes and then launched into a stream of statements about the incident.  After about a minute, Johnson was able to interrupt and get him to stop and listen to her questions.  She asked Silva if he wanted a lawyer with him while he answered questions.  Silva said yes, but continued to talk about the accusations against him.  Johnson told him that he needed to stop because he wanted a lawyer.  Silva said he did not understand and asked if they were going to take

him somewhere else. The officers left the room. After a few minutes, Silva began talking to himself or an imaginary listener about the incident. The video recording ended a few minutes later. Silva does not assert that he was questioned further after Johnson and Miraballi left the room.

¶ 37    After hearing argument from the parties, the trial court denied the motion to suppress. The court noted that Silva called someone on his phone and asked for a lawyer at about 9:30 p.m., and told the police that he had done so. However, at 10:44 p.m., Silva banged on the door and asked when the police were going to come talk with him, which was an indication that he was willing to answer questions. This was a voluntary reinitiation of communication by Silva. Before that point, there had not been any interrogation of him.

¶ 38    The court further found that, once the interrogation began, Silva indicated several times that he wanted a lawyer. However, each time, the police stopped questioning him, and Silva then said that he wanted to continue answering questions. Accordingly, the trial court found that Silva had voluntarily waived his right to an attorney and that the police did not violate his rights by continuing to question him.

¶ 39    The video of Silva's interrogation was not shown to the jury at trial. However, Miraballi testified about Silva's statements as described in ¶ 14, *supra*, and the State invoked Silva's statement about "something happened in the park" multiple times during its closing arguments.

¶ 40    On appeal, Silva argues that: the police violated his constitutional rights by continuing to question him after he had invoked his right to counsel; even if he reinitiated contact with the police, his waiver of his right to counsel was not knowing and voluntary; and the erroneous admission of his statements at trial was not harmless as the State repeatedly used his statements against him. The State responds that Silva clearly reinitiated communication with the police at 10:44 p.m., over

an hour after his phone call seeking a lawyer. Further, every subsequent time that Silva mentioned wanting a lawyer, he then affirmed that he wanted to continue speaking with them without waiting for a lawyer to be present (until his final request for counsel, which they honored by terminating the interrogation). The State also argues that any error in not suppressing Silva's custodial statements was harmless, as Silva's statements and conduct prior to being taken into custody were equally probative of his guilty mind, and there was other evidence, such as his picture on Larson's phone and Larson's testimony and identification of him, that proved his guilt beyond a reasonable doubt.

¶ 41    In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that, to safeguard the constitutional right against self-incrimination, those who are subjected to custodial interrogation are entitled to have counsel present during the questioning. *People v. Mandoline*, 2017 IL App (2d) 150511, ¶ 102. Under *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981), "an individual who has indicated that he wishes to deal with the police only through counsel" may not be subjected to "further interrogation by the police *** unless the accused himself initiates further discussion with the police." *Mandoline*, 2017 IL App (2d) 150511, ¶ 102.

¶ 42    A two-step analysis applies in determining the admissibility of any statements made after the accused has invoked his right to counsel. *Id*. ¶ 103. First, the court must determine whether it was the defendant or the police who reinitiated communication after the defendant invoked his right to counsel. If the defendant was the one who reinitiated communication, the second issue is whether he waived his right to counsel voluntarily, knowingly, and intelligently. *Id*. In making this latter assessment, courts consider "the totality of the circumstances, including the fact that the defendant reopened the discussion." *Id*.

¶ 43    Our review of the trial court's ruling on the defendant's motion to suppress involves questions of both law and fact. *People v. Richardson*, 234 Ill. 2d 233, 251 (2009).  We accord great deference to the trial court's findings of fact and will not reverse them unless they are against the manifest weight of the evidence. *Id.*  However, the ultimate question of whether a confession was voluntary is a legal question which we review *de novo*. *Id.*  In making this determination, we consider the evidence presented at trial as well as that presented at the suppression hearing. *Id.* at 252.

¶ 44    Here, the trial court found that Silva's acts of placing a telephone call seeking a lawyer and then telling police that he had done so constituted an invocation of his right to have an attorney present during questioning, but he voluntarily reinitiated communication with the police at 10:44 p.m. when he banged on the door and asked when they were going to come talk with him.  We agree with both of these findings.

¶ 45    "In order for the accused to 'initiate' contact, the accused must make a statement that evinces a willingness and a desire for generalized discussion about the investigation." *People v. Crotty*, 394 Ill. App. 3d 651, 656 (2009) (citing *People v. Woolley*, 178 Ill. 2d 175, 198 (1997)).  Silva argues that his question about when the police would come to talk with him did not rise to this level and was not a reinitiation of communication with the police.  In support of this argument, he cites *People v. Flores*, 315 Ill. App. 3d 387, 393 (2000), in which a reviewing court found that a defendant asking "what's happening?" upon encountering a group of people while being led to the bathroom did not indicate a desire to re-engage with the police about his case.  This court has criticized the analysis in *Flores* and instead follows the approach taken by the United States Supreme Court in *Oregon v. Bradshaw*, 462 U.S. 1039 (1983), and by our own supreme court in *Woolley*.  See *Crotty*, 394 Ill. App. 3d at 660.  In *Bradshaw*, the defendant invoked his right to

have a lawyer present during questioning, and the police ceased interrogating him. However, during a transfer to another holding facility, he asked a police officer "Well, what is going to happen to me now?" *Bradshaw*, 462 U.S. at 1042. The Supreme Court held that, "[a]lthough ambiguous, the respondent's question in this case as to what was going to happen to him evinced a willingness and a desire for a generalized discussion about the investigation; it was not merely a necessary inquiry arising out of the incidents of the custodial relationship." *Id.* at 1045-46. Similarly, in *Crotty*, after invoking his right to counsel and being left alone, the defendant then asked for someone to come talk to him, and when the detective was brought to him, he asked the detective about what was happening and "the process." *Crotty*, 394 Ill. App. 3d at 653-54. Relying on *Bradshaw*, we held that these questions "indicated his desire and willingness to engage in a generalized discussion about the investigation. *Id*. at 661.

¶ 46    Applying these principles here, Silva's question about when the police were going to talk with him demonstrated a willingness to speak with them about the investigation, and was not simply a question about some aspect of his custody. Further, once the police began speaking with him again but before they asked him any questions about the incident, Silva told them that he would help them and would answer their questions. We therefore agree with the trial court's determination that Silva reinitiated communication with the police, waiving his prior invocation of his right to counsel.

¶ 47    Silva's next argument involves the second step of the two-step analysis identified in *Mandoline*: if the court determines that the defendant reinitiated contact with the police, it must then determine whether the defendant's waiver of his right to counsel was voluntary, knowing, and intelligent. *Mandoline*, 2017 IL App (2d) 150511, ¶ 103. We begin by setting out the tests applicable to each of these concepts.

> "The test for voluntariness is whether the defendant made the decision freely, without compulsion or inducement, or whether the defendant's will was overborne at the relevant time. [Citation.] To implement this test, we consider the totality of the circumstances surrounding the statements, including the defendant's age, intelligence, education, experience, and physical condition at the relevant time; the duration of the interrogation; the presence of *Miranda* warnings; the presence of any physical or mental abuse; and the legality and duration of the detention." *Id.* ¶ 116.

As for whether the statements were made knowingly and intelligently, "we consider the specific facts and circumstances, including the defendant's background, experience, and conduct." *Id.* ¶ 128. The trial court's determination as to whether statements were made voluntarily, knowingly, and intelligently is a finding of fact, and we will not disturb that determination unless it was against the manifest weight of the evidence. *People v. Phillips*, 226 Ill. App. 3d 878, 886 (1992).

¶ 48 Silva's arguments do not rest on any specific aspect of these tests such as his individual characteristics, and he does not assert that the interrogation was particularly coercive. Instead, he argues that his repeated references during the interrogation to calling his lawyer and his frequent requests that the police tell him what was going on show that he did not understand the choice he was facing of answering questions without a lawyer present or else ceasing all communication with the police. He also argues that the police officers' conduct in continuing to question him despite his references to calling his lawyer led him to believe that his invocation of his right to counsel would not be honored and that he had no choice but to speak with them. Accordingly, he contends, his custodial statements should have been suppressed.

¶ 49    We reject these arguments.  The assertion that the police essentially undermined his attempts to assert his rights is belied by the record, which shows that whenever he mentioned getting a lawyer, the police immediately stopped questioning him about the incident until he affirmed that he wanted to keep talking with them despite the absence of his lawyer.  Nor did the police use coercive tactics on him or deprive him of basic comforts such as coffee or bathroom use; they simply left him alone for a time while conducting their investigation.  The video evidence does not support Silva's claim that his statement was not voluntarily made.

¶ 50    Silva also argues that he did not knowingly and intelligently waive his constitutional rights after he was given *Miranda* warnings.  The requirement that any post-*Miranda*-warning waiver of rights be made knowingly and intelligently is a separate requirement from the requirement of voluntariness.  See *People v. Bernasco*, 138 Ill. 2d 349, 356 (1990).  "[I]ntelligent knowledge in the *Miranda* context *** need not mean the ability to understand far-reaching legal and strategic effects of waiving one's rights, or to appreciate how widely or deeply an interrogation may probe, or to withstand the influence of stress or fancy."  *Id*. at 363.  Rather, "to waive rights intelligently and knowingly, one must *** understand basically what those rights encompass and minimally what their waiver will entail."  *Id.*  Generally, the demands of the fifth and sixth amendments to the United States constitution will be met where the defendant is "aware of two points: (1) he had a right to consult with an attorney, to have an attorney present during questioning, and to have an attorney appointed if he could not afford to retain one privately; and (2) any statement that he made could be used against him in criminal proceedings, and an attorney's presence during questioning could serve him by affording him advice on making any statements."  *Id*. at 360-61 (discussing the holding of *Patterson v. Illinois*, 487 U.S. 285 (1988)).  It is this level of awareness, which is ordinarily supplied by the giving of *Miranda* warnings, that is "necessary in order to constitute the

intelligent knowledge that *** is required for blunting the coercive effects of police interrogation in a *Miranda* waiver context." *Id.* at 361.

¶ 51 In cases where *Miranda* warnings have been given and a defendant then waived them and gave a statement, generally the defendant must show some reason why those warnings were not sufficient to make him aware of his rights, such that his waiver was not valid. Such reasons may include the defendant's particularly low level of intellectual functioning, or an inability to understand the warnings because of language difficulties. See, *e.g.*, *id.* at 362 (*Miranda* warnings were insufficient to show knowing and intelligent waiver of rights where defendant's response to questions during the suppression hearing showed that he had difficulty understanding even relatively simple concepts and there was expert testimony of his below-level intelligence); *People v. Braggs*, 209 Ill. 2d 492, 501-02 (no knowing and intelligent waiver where defendant functioned at a kindergarten level and could not answer simple questions about the meaning of the words used in the warnings she had been given); *cf. People v. Son Le*, 2014 IL App (1st) 121989-U, ¶ 25 (affirming the trial court's denial of a motion to suppress where evidence indicated that the defendant adequately understood the warnings given in English, even though his first language was Vietnamese and he had limited proficiency in English).

¶ 52 Here, however, Silva does not argue that he could not understand the *Miranda* warnings he was given. Rather, he simply argues that his repeated questions about what was going on during his detention showed that he was confused and did not fully grasp how to assert his rights effectively. Silva cites no precedent suggesting that this is sufficient to show that his waiver of his *Miranda* rights was not knowing and intelligent. To the contrary, "[t]he Constitution does not demand 'that the police supply a suspect with a flow in information to help him calibrate his self-interest in deciding whether to speak or stand by his rights' [*quoting Moran v. Burbine*, 475 U.S.

412, 422 (1986)], and there is no Federal constitutional right to confess only when in possession of information that 'could affect only the wisdom of a *Miranda* waiver, not its essentially voluntary and knowing nature' [*quoting Colorado v. Spring*, 479 U.S. 564, 5 (1987)]." *Bernasco*, 138 Ill. 2d at 359-60.

¶ 53 To sum up, the trial court did not err in finding that Silva's statements were made voluntarily, knowingly, and intelligently, nor did it err in denying the motion to suppress those statements. Because we conclude that there was no error, we need not reach the arguments about whether any error was harmless.

¶ 54                                    III. CONCLUSION

¶ 55 For the reasons stated, the judgment of the circuit court of Du Page County is affirmed.

¶ 56 Affirmed.