2022 IL App (2d) 200712-U
No. 2-20-0712
Order filed November 23, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Petitioner-Appellee, | ) ) | |
| v. | ) ) | No. 17-CF-1574 |
| FARID S. RAKIN, | ) ) | Honorable Patricia S. Fix, |
| Respondent-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices Hutchinson and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Trial court did not commit reversible error in denying suppression of defendant's statement, questioning jurors during *voir dire*, or admitting certain lay opinion evidence, but defendant must be resentenced.

¶ 2    A jury found the defendant, Farid Rakin, guilty of the first degree murder of Ciera Davis after he fired seven shots toward her car, striking her in the head and chest and killing her. He was sentenced to 60 years in prison. He appeals, arguing that his confession was involuntary, improper *voir dire* amounted to plain error, the trial court should not have admitted a witness's opinion about

the victim's intentions, and the trial court improperly relied on elements of the offense to increase his sentence. We affirm Rakin's conviction, vacate his sentence, and remand for resentencing.

¶ 3                                    I. BACKGROUND

¶ 4     On the night of June 4, 2017, Rakin helped organize a birthday party at 1632 11th Street in Waukegan that extended into the early morning hours of June 5. Davis attended. She had long been friends with Rakin, but recently Rakin had started and then ended a brief sexual relationship with her. Also present was Rakin's girlfriend, Nicole Maise, with whom Rakin had recently reunited. Davis and Maise got into a fight. People at the party forced Davis to leave. Once outside, Davis hit Rakin's car with a stick, poured gasoline on it, and then began to ram his car with her own. While in her car, Davis was shot twice. She was taken to a hospital where she was pronounced dead.

¶ 5     The police arrived on the scene within an hour after the shooting. The police found Davis's car in the street, in neutral with the engine running. The car was positioned diagonally, near the entrance to a common driveway that led to the party house and the house to the north of it. The front wheels of the car were turned roughly parallel to the street. The driver's side door was open but no one was inside. There was blood on the driver's seat. There were bullet holes in the front passenger side window and door. The front windshield was intact.

¶ 6     During their investigation, the police recovered a gun later found to have fired the bullets that struck and killed Davis. There were no fingerprints or DNA on the gun. One of the partygoers identified Maise as the shooter, and Maise was initially charged with the murder of Davis. Waukegan police detective Charles Schletz and his partner spoke with Maise, who denied shooting Davis, and the charges against her were dismissed. Another witness to the shooting identified

Rakin as the shooter and said Rakin's son, Trevor Smith, had handed him the gun used in the shooting. A warrant for Rakin's arrest was issued.

¶ 7     On August 22, 2017, officers learned that Rakin was at a motel in Racine, Wisconsin, and they executed the warrant. When Rakin was arrested, Maise was with him, and the police found illegal drugs in the motel room. Both Rakin and Maise were taken to the Racine police station.

¶ 8     Rakin was interviewed by Schletz and his partner, who videorecorded the questioning. The interview began at 12:20 p.m. and lasted for about one hour and 50 minutes. Schletz read the *Miranda* warnings and Rakin indicated that he understood each of his rights. The tone of the interview was conversational throughout. Schletz frequently exhorted Rakin to say what had happened but did not yell or verbally abuse Rakin.

¶ 9     Schletz began to talk about Davis. Rakin asked why the police had arrested Maise. Schletz started to explain why Maise had been charged earlier with Davis's shooting, but Rakin clarified that he meant what had happened "today." Schletz said Maise was being detained "for safety" and explained that, while the Racine police were concerned with the drugs found at the motel, he and his partner were interested in "what happened in Waukegan." Rakin again asked about Maise and whether she was in custody; Schletz said she was there for questioning but had not been charged. Rakin said Maise was not involved with the drugs found at the motel.

¶ 10    Schletz continued speaking about Davis's shooting. He spoke at length, telling Rakin that the police knew from witnesses what had happened, that he saw Rakin as a respected person and someone who felt bad about Davis's death, and that it was clear that Davis had been "out of control." Asked what happened, Rakin recounted his relationships with Davis and Maise and their fight at the party. Schletz noted that Maise was identified by one person as the shooter. Rakin said she was not involved and had been inside the house when Davis was shot. Schletz described

Maise crying during her earlier interview and saying Rakin would do right by her and would not hurt her. Rakin continued describing the events of that night. After Davis had been forced to leave the party, people called him outside, telling him that Davis was pouring gasoline on his car. (Rakin's Dodge was parked in a common driveway near the house next door.) Rakin said that he saw Davis pouring the gasoline but did not care as he had insurance. He went back inside, but he was again called outside when Davis began ramming his car with her car, an Oldsmobile Bravada.

¶ 11    After seeing Davis ram his car, Rakin tried to open the front passenger side door of the Bravada but it was locked. Davis then backed up and drove forward to ram Rakin's car again, hitting Rakin's knee as he moved out of the way. Rakin said that his leg was injured and that he still could not stand for more than five seconds. However, he did not complain of any pain during the interview.

¶ 12    Schletz asked Rakin if he thought Davis was trying to run him over. Rakin said no. Although Davis had struck him with her car, she was not trying to hit him. She was trying to smash his car. He asserted that "she didn't try to run me over and I didn't think she was going to try to run me over." He denied shooting at Davis. Asked whether, when she was shot, Davis had been trying to leave or trying to hit him, Rakin repeated that she was not trying to hit him. She was just enraged.

¶ 13    Schletz told Rakin that the police had found the gun used to shoot Davis, Rakin's fingerprints were on it, and there was video of Rakin going to the area where the gun was found. Schletz suggested that the shooting of Davis could be seen as a sad but understandable accident that occurred because she was out of control. Schletz again mentioned Maise's earlier arrest for the shooting and her identification by one person as the shooter, saying that they needed the defendant's account and that, although the warrant had been quashed, the charges against Maise

had not been dropped while the investigation was continuing. Over the next 40 minutes or so, Schletz repeated these themes—the strength of the evidence against Rakin, including eyewitnesses' statements and the gun that supposedly bore Rakin's fingerprints; Schletz's opinion that Rakin was not a cold-blooded killer but someone who cared about and protected those around him; and the argument that if Rakin admitted that he shot Davis, it would protect people Rakin cared about (Maise and Rakin's son) from prosecution. Rakin continued refusing to answer questions about the shooting itself.

¶ 14    About an hour after the interview started, Schletz noted that, while Rakin was 49 years old, the women he was involved with were much younger and thus were more unfortunate: Davis "only got" 25 years to live before she was killed, and Maise was just 27, had a young child, and was "crying her eyeballs out" over facing possible jail time for the drugs in the motel room and Davis's murder. Rakin repeated that Maise had "nothing to do with" any of it and offered to sign a statement taking responsibility for the drugs found at the motel. However, he did not respond to Schletz prodding him to confess to the shooting.

¶ 15    Schletz told Rakin that what Rakin said would affect the charges that he would eventually face, commenting that "Not everybody that kills somebody *** is charged with the same thing or gets charged." Rakin received this skeptically, leaning back in his chair with his arms folded, and said the police would not believe his story. Schletz said he could believe "almost anything" based on the position of Davis's car in the street. Yawning prodigiously, Rakin began to describe the events preceding Davis's shooting again, emphasizing that Maise was not outside at the time and was not involved, saying that the last thing he wanted was for anything to happen to his girl. But, yawning more, he declined to talk about the shooting itself, saying he just did not want to go into it. Rakin also rejected Schletz's suggestion that he could reduce the charges brought against him

by giving a statement admitting to shooting Davis.  He noted that, with a weapon involved, he would spend the rest of his life in jail even on lesser charges.  Schletz continued to suggest that the charges against Rakin could be reduced, depending on what he told them, and might be only second degree murder or aggravated unlawful use of a weapon.  Not getting a response, Schletz dropped this tack and began to emphasize that he and his partner would be "straight" with Rakin and Maise, just as they were when they went to the State's attorney earlier about dropping the charges against Maise.  When Schletz suggested that Rakin could "straighten this shit out" and retire to a family home in Mississippi, Rakin skeptically asked how that could happen, and Schletz admitted he did not know but urged Rakin to "take a chance" by giving his account of the shooting.  Rakin continued to offer little or no response for another 20 minutes as Schletz talked.

¶ 16    About an hour and a half after the interview started, Rakin leaned forward with his head down and appeared to be thinking.  Rakin then asked Schletz what the police were going to do with Maise.  Schletz said he had told Maise that he would come back and talk with her after they finished talking with Rakin.  Rakin then asked if the interview was being recorded, and Schletz said it was.  Schletz said that he and his partner were being "fair."  Schletz offered to let Rakin talk to Maise "after this."  Rakin was silent for a moment.  He asked if he could talk to Maise first and Schletz said no.  If, however, Rakin told them about Davis's shooting, they would tell the Racine police that he was willing to take responsibility for the drugs in the motel room, and he could talk with Maise.  Schletz said he would not leave Maise in jeopardy just to gain advantage, again noting that he had helped Maise when she was charged with the shooting earlier.  Rakin acknowledged this, saying Maise had told him that some officers helped her to get released.  Schletz said he and his partner had to "go against" their bosses to argue for Maise's release.

¶ 17    Rakin paused in thought again.  He then asked whether, if he took responsibility for the shooting, the police would let Maise go.  Schletz said, "absolutely" if Rakin told them about the shooting, he would speak with the State's attorney and tell him "what happened."  Rakin asked if they would let Maise go that day.  Schletz said "yes" and promised that he and his partner would "call the State's attorney" and would "tell him there's no reason to charge her and completely quash all the charges."  Rakin then began talking, admitting that the shooting "basically" happened the way Schletz had been theorizing during the interview.  When describing Davis's actions in ramming his car and striking his knee in the process, Rakin said that Davis had been trying to hit him, but only so he would move out of the way so that she could keep ramming his car.  Someone near him had a gun and was talking about "handling" Davis; Rakin took the gun away from him because he did not like the bloodthirsty tone of the person's comments.  He fired at Davis with his nondominant hand, intending to scare her away.  He did not realize that he had killed her, as he left immediately after shooting.

¶ 18    Rakin was indicted on two counts of first degree murder, alleging that he shot Davis (1) with the intent to kill her or inflict great bodily harm, or (2) knowing that his actions created a strong probability of death or great bodily harm (720 ILCS 5/9-1(a)(1), (a)(2) (West 2016)).  His counsel moved to suppress the videotaped statement described above on the basis that it was involuntary because it was procured by Schletz's misrepresentations and promises.  Counsel also moved to suppress a statement Rakin made to police a day later, arguing that that second statement was involuntary and was made after Rakin invoked his wish to remain silent and for an attorney. After a hearing, the trial court suppressed Rakin's second statement but not his first, finding the first statement voluntary in light of Rakin's, age, intelligence, experience with the criminal justice

system, the short duration and conversational tone of the questioning, and the lack of physical coercion.

¶ 19    Prior to trial, Rakin filed a motion *in limine* to bar Marqueta Bronson from testifying speculatively about Davis, specifically, that Bronson knew Davis died from the second shot because she could just feel it, that Bronson could just tell that Davis intended that the ramming of Rakin's car right before she was shot would be the last one, that Davis was intending to get out of there when she put the car in drive the last time, that there was no need for any more shots, and that it was cold-blooded murder.  The State did not object and the trial court granted the motion.

¶ 20    During jury selection, the trial court questioned the jurors regarding the principles enunciated in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012).  As to three of the four principles, the trial court questioned the prospective jurors regarding whether they (1) understood and (2) accepted the principles.  As to the first principle, however, the trial court failed to ask several of the prospective jurors whether they not only understood but also accepted the presumption of innocence.  Five of the seated jurors were drawn from the incorrectly questioned juror panels.

¶ 21    At trial, the State introduced the testimony of four occurrence witnesses.  Chavone White arrived at the party about 1 a.m.  She saw a fight between Davis and another woman that left broken glass on the floor.  People made Davis leave the house and White began sweeping up the glass.  As she was going out the door to leave a little while later, she heard four or five shots.  She did not see the shooting.  She dropped to the ground and stayed there until it seemed safe to get up.  She then went to her car to leave.  She saw Davis's body, which looked "lifeless," being put in another vehicle.  She left.

¶ 22 Rickey Matthews, a felon, arrived at the party at 7 or 8 p.m. He saw Davis, an old acquaintance, and spoke with her. He stayed outside, talking with people, smoking marijuana, eating, and drinking. Later in the evening, he saw Davis come out of the house. She was angry, loud, and cursing. Davis grabbed a stick and began hitting Rakin's car but did not damage it. People gathered around her and tried to get her to leave. Davis then got into her car and began ramming Rakin's car, driving into it and then backing up and hitting it again. She rammed it four times. Matthews testified that, when Davis was "coming back I guess to do it again," he heard shots ring out. Rakin was shooting at Davis from an arm's length away from Matthews, near the street and sidewalk. Matthews had not seen Rakin actually get hit by Davis's car, but Rakin jumped out of the way right before he fired at Davis. Rakin was about 10 feet away from Davis's car when he fired four or five shots. Matthews saw Davis slumped in her car and then someone took her to the hospital in another car. He left as the police were arriving.

¶ 23 Shalanda Barnett was a close friend of Davis's sister. She arrived at the party early and saw Davis already there. Rakin arrived later with Maise. After a while, Davis and Maise got into a fight. When Davis left the house, Barnett followed her. Davis began to hit Rakin's car with a stick. Barnett physically restrained her and also called Davis's sister to talk to Davis, but Davis was still very upset. At that point, Barnett "wrestled her down" and took Davis's keys. Barnett, who was asthmatic, then went to her own car to get her inhaler. When she was in her car she heard a loud bang and looked in her rearview mirror to see Davis driving forward and back and striking Rakin's car. Barnett was beginning to turn her car around when she heard a gunshot. She looked back and saw Davis's car in the middle of the street, or half in the street, rolling backwards. Barnett finished turning around and drove toward Davis's car, where someone put Davis in the back of Barnett's vehicle. Barnett took Davis to the hospital but when she arrived Davis was dead.

¶ 24　　The fourth witness, Bronson, testified that she was standing in the adjacent driveway near Rakin's car when Davis began ramming it. Davis rammed Rakin's car at least eight or nine times. Asked whether Davis was leaving the driveway, Bronson confusingly said that Davis was, but she wasn't, and also that Davis was "getting ready to take off." The defense objected to this statement as speculation that violated the motion *in limine*; the trial court sustained the objection on a different basis, narrative. Bronson then testified that Davis was pulling back "maybe 10" feet on each reverse, although that night she had told a detective that it was only a few feet.

¶ 25　　Bronson testified that she saw Rakin come outside and try to stop Davis by "possibly hitting the hood." Rakin then went inside but came back out and went to the middle of the street and pulled out a gun. Meanwhile, Davis continued to ram Rakin's car. When Davis backed up for the last time, she hit Bronson's car, which was parked across the street. When Bronson said that Davis was trying to get away, the trial court sustained a defense objection to the statement.

¶ 26　　Bronson said that she saw Rakin shoot twice at Davis's car and, after a brief pause, shoot another four or five times. Asked if Davis's car was backing up when Rakin shot, Bronson said it looked like Davis was about "to pull off." The trial court overruled the defense objection. The State asked why Bronson thought Davis put the car in drive and Bronson repeated that it seemed to her that Davis was preparing to pull off. The trial court again overruled a defense objection. Asked if she heard the gear shift or change, Bronson initially said yes. However, she later testified that she did not hear the gear change and that she would be lying if she said she did.

¶ 27　　Bronson described the car as "rolling" after the second shot. Asked which direction it was rolling, she said, "I would say heading straight" and that Davis was heading as if she was about to make a U-turn, saying, "You know, you straighten the wheel up and take off?" A defense objection was overruled. Bronson then said again that it looked to her like Davis was preparing to take off.

Before cross-examination, the defense moved to strike all of Bronson's testimony about her perceptions of where Davis was going to drive. The trial court denied the motion, saying that the defense could address the movements of Davis's car through cross-examination. Instead, the defense used cross-examination to establish that Bronson had been drinking throughout the night, had been at another party before arriving at this one, described her own condition that night as "drunk," and had been taking ecstasy and smoking marijuana as well.

¶ 28   The State then introduced forensic evidence through witnesses. Police who responded to the scene testified to their observations, the photographs they took, the footage from their body cameras, and the position of the seven spent shell casings they found in the driveway and the driveway apron area. Three casings were found in the northernmost side of the common driveway, between Rakin's car and and the sidewalk; three more were found on that side of the driveway but closer to the sidewalk and driveway apron into the street; and one was found at the edge of the street on the southern side of the driveway. A handgun was found behind Rakin's home and a semiautomatic handgun was found in a wooded area about a block away. The bullets found in Davis's body and at the scene matched the semiautomatic. One of the forensic witnesses testified about the way that such guns eject cartridge casings. He agreed that such casings could bounce or roll or be kicked in ways that would affect the positions where they were found. Rakin's car had some damage to the rear and had been pushed forward into the siding of the house it was parked behind, creating a large indentation. Davis's car had damage to the front bumper and the right rear bumper, as well as the shot-out front passenger window and driver's window, and a bullet hole in the right front door.

¶ 29   A forensic pathologist testified about the path of two bullets that struck Davis. One entered her right cheek, passed through her brain, and partly exited her left ear, moving from front to back,

right to left, and slightly upwards. The other bullet entered Davis's right chest, traveled through her left chest, and exited her upper left arm. The wounds likely rendered Davis unconscious immediately or within a short time. Toxicology reports showed the presence of THC and that Davis had a blood alcohol concentration of .086.

¶ 30     Schletz testified about his interview of Rakin, and the video recording of that interview was played for the jury. The State then rested.

¶ 31     The sole defense witness was Rakin. He testified that he had helped organize the party and asked Davis not to attend because he did not want a fight. He related that Davis did attend and fought with Maise. After the fight, Davis was escorted outside and people began preparing to leave. It was about 3 or 4 a.m. He was inside when someone came to get him, saying that Davis was trying to set his car on fire. He went outside and saw Davis hitting his car window with a stick. She then poured gasoline on his car and threw the gas can at him, getting gas on him. Rakin went inside, changed his shirt, and put a jacket on. Maise was still inside. He was not worried about damage to his car as he had insurance. People again came in to get him, telling him that Davis was ramming his car. He went outside and saw her ramming his car. It was loud and people were screaming.

¶ 32     He went up to Davis's car and tried to open the front passenger door but it was locked. Davis backed up. Rakin stood between Davis's car and his own, trying to get her to stop, but she drove forward. Rakin moved out of the way but Davis's car struck his knee as it rammed his car. Rakin fell to the ground. He stood up and pulled out a gun. Davis backed up and drove forward to ram his car again, once more forcing him to jump out of the way. She then backed up and drove forward again. As she rammed his car, Rakin decided to fire. Davis was driving toward him and he felt that he was in danger and was scared that she might hit him or run him over. Although he

was left-hand dominant, he fired with his right hand, intending to disable Davis's car. The shooting lasted only a few seconds. He did not intend to hurt her. It worked; her car stopped moving. Rakin began walking away. He could not run because his knee was in severe pain. A block or so away he disposed of the gun in a wooded area and left. He did not know Davis had died until the next day when someone told him. He was later arrested with Maise in Racine.

¶ 33    Rakin admitted that he lied to Schletz about the gun during the interview. It was his own gun, which he had brought to the party. Rakin's goal in talking with Schletz was to clear Maise's name by establishing that she did not shoot Davis. Schletz dominated the conversation and Rakin did not feel he really had a chance to tell Schletz his side of the story. Asked to explain his statements to Schletz that he did not believe that Davis was trying to kill him, Rakin said that he was trying to express that, although she was not trying to kill him, she was enraged and was trying to hit him with her car. He shot intending to stop her car and did not mean to shoot her.

¶ 34    On cross-examination, Rakin reiterated that Davis was not trying to kill him. Killing her was an accident. Although he was trying to save his own life as Davis's car was again coming toward him, he shot with his non-dominant hand at the vehicle. Rakin testified that he had never shot a gun before, but conceded that the gun belonged to him and that he knew how to load and shoot it. Questioned again about his statements that he did not believe that Davis was trying to hit him with her car or kill him, Rakin said:

> "I am saying *** that she was enraged so she did not care if I was collateral damage. I don't believe her intention was to run me over, but by she being out of control she could have still ran me over whether she was intending to or trying to or not."

He continued, "Any time during the encounter after I was hit, once I was hit then I knew it was a chance that I could have been hit again."

¶ 35    Regarding the interview with Schletz, Rakin acknowledged that the police were respectful and did not abuse him, and he had had the chance to eat and sleep shortly before he was arrested. Although his knee was hurting, the pain was not so bad that it affected his ability to answer the questions. He had taken some college courses and could speak articulately with Schletz. He understood his rights and understood the questions he was asked. He had not spent long in the interview room before the interview started. No one yelled at him and he did not ever think Schletz was mad at him.

¶ 36    The jury was instructed on first degree murder, second degree murder, and self-defense, and asked to also find whether Rakin personally fired a gun and caused someone's death. The jury found Rakin guilty of first degree murder and found that he had fired a gun causing death. The trial court denied his motion for a new trial.

¶ 37    At sentencing, the State presented three family members of Davis who read letters into the record. The defense presented five letters in mitigation. Rakin spoke in allocution, apologizing to Davis's family and saying that he had not meant to cause them pain. The State then spoke about several of the statutory factors in mitigation and argued that none of them applied. Specifically, the State argued that Rakin knew that his actions were likely to cause serious physical harm. It argued that the embarrassment, humiliation, and even the physical pain he suffered were not "strong provocation" that would justify his actions, especially in light of his age and maturity compared to Davis. No one else induced or facilitated his actions. Further, he had a lengthy and substantial criminal record beginning as a juvenile, which included several gun offenses, he had no intellectual disability or mental illness, and he had no physical condition that would be worsened by imprisonment. As for factors in aggravation, the State highlighted Rakin's criminal

history and also argued that a lengthy sentence was necessary to deter others from committing similar crimes. The State requested a sentence of 75 years.

¶ 38 The defense argued that, in fact, several factors in mitigation applied. As to provocation, Davis was drunk and angry enough to repeatedly ram Rakin's car, and she hit him with her car. Rakin's criminal history reflected repeated possessory offenses of drugs and weapons, but his only crime of violence occurred back in 1989. The defense disagreed that a longer sentence was needed to deter others, arguing that the shooting was an impulsive act in a chaotic situation and was less likely to serve as deterrence to others. The defense also stressed the stable and caring family man depicted in the letters in mitigation, noting that that side of Rakin was new to the court, which had only seen him on trial for murder. Observing that even the statutory minimum would be a *de facto* life sentence as, with the mandatory 25-year add-on, Rakin could not be released until he was more than 90 years old, the defense asked for the minimum of 45 years.

¶ 39 The trial court stated that it had considered all of the evidence presented at trial as well as at the sentencing hearing, Rakin's statement in allocution, the arguments of both sides, and the statutory factors. It then chose to highlight certain factors:

> "I have to consider as a factor in aggravation that the defendant's conduct caused and threatened serious physical harm. I appreciate and hear the defense arguments that this was an impulsive act, albeit, intentional as found by the jury. However, when somebody picks up a handgun and it's loaded, by [its] very nature that action, once that handgun is discharged, causes and threatens serious bodily harm to another, which is the problem with handguns in our society."

Regarding provocation, the trial court found that although the act was impulsive and "alcohol, jealousy, and anger fueled the actions of everyone that evening," that did not justify or excuse

Rakin's actions.   The trial court expressed sadness in observing that Rakin's mother had died when he was 11 years old, and now Rakin's actions in shooting Davis meant that her 6-year old child had lost his own mother.  The trial court considered Rakin's criminal history, commenting that it found it "stupefying" that, by the age of 50, Rakin had been sentenced to 33 years in prison on his various offenses (although, with good time credits, he had spent less time than that in prison).  This consistent criminal activity contradicted the depiction of a loving family man and provider shown in the letters in mitigation.  The trial court imposed a sentence of 60 years.

¶ 40    Rakin moved to reconsider his sentence, arguing in part that the trial court erred in considering that his conduct caused and threatened serious physical harm, as this factor was inherent in the offense as charged.  In its ruling, the trial court acknowledged that it had stated that it was considering the physical harm caused by Rakin's actions, and that that was an improper factor to consider.  Nevertheless, it denied Rakin's motion to reconsider the sentence, saying that it "suspect[ed]" that, when it made that statement, it "was looking at the totality of the circumstances and the totality of the events," and the sentence was appropriate under the totality of the circumstances.  This appeal followed.

¶ 41                                    II. ANALYSIS

¶ 42    On appeal, Rakin argues that (1) his videotaped statement was involuntary and inadmissible because it was procured by police promises and deception, (2) the trial court's errors in questioning potential jurors under Supreme Court Rule 431(b) amounted to plain error because the evidence was closely balanced, (3) the trial court abused its discretion by permitting Bronson to testify about Davis's supposed intention to leave the scene, and (4) the trial court improperly relied on a factor inherent in the offense when sentencing him.  We examine each argument in turn.

¶ 43                    A. Voluntariness of Statement to Police

¶ 44    Rakin first argues that Schletz promised leniency for Maise and himself if he confessed to the shooting, and Schletz also lied about the evidence against him. Because of this, he argues, his statement was involuntary and inadmissible.

¶ 45    The requirement that a defendant's confession be voluntary flows from two aspects of the United States constitution: the due process clause of the fourteenth amendment (U.S. Const., amend. XIV), under which the United States Supreme Court has condemned certain interrogation techniques which, either in themselves or in their effect on "the unique characteristics of a particular suspect," are "offensive to a civilized system of justice," and also from the fifth amendment's proscription against compelled self-incrimination (U.S. Const., amend. V). *People v. Richardson*, 234 Ill. 2d 233, 251 (2009) (quoting *Miller v. Fenton*, 474 U.S. 104, 109 (1985)). Because of these constitutional concerns, a confession that is not voluntary must be excluded. *Id.* at 253. The State bears the burden of showing that the confession was voluntary. *Id.* at 254.

¶ 46    In considering whether a confession is voluntary, a court considers factors relating to the defendant himself, including the defendant's age, intelligence, background, experience, education, mental capacity, and physical condition at the time of questioning; and also the circumstances of the questioning, such as the legality and duration of the detention, whether the suspect was given *Miranda* warnings, the duration of the questioning, and the interrogator's use of threats, promises, or deception to induce the confession. *Id.* at 253-54; *In re J.J.C.,* 294 Ill. App. 3d 227, 234 (1998). None of these factors is dispositive; a court must consider all of the circumstances in the case before it. *Richardson*, 234 Ill. 2d at 253. In applying these factors the court must bear in mind the ultimate question to be answered, which is " 'whether the defendant made the statement freely, voluntarily, and without compulsion or inducement of any sort, or whether the defendant's will

was overcome at the time he or she confessed.' " *People v. Slater,* 228 Ill. 2d 137, 160 (2008) (quoting *People v. Gilliam,* 172 Ill. 2d 484, 500 (1996)). A reviewing court accepts the factual findings of the trial court unless they are against the manifest weight of the evidence, but considers *de novo* the overarching question of whether the State met its burden to show that the defendant's statement was made voluntarily. *People v. Murdock*, 2012 IL 112362, ¶ 29.

¶ 47 Here, Rakin does not take issue with the trial court's assessment of his age, intelligence, experience, and other factors related to each unique defendant, or with its findings that the questioning was legal, included appropriate *Miranda* warnings, and did not last overly long. Indeed, the State argues that all of these factors favor the conclusion that Rakin's statement was voluntary, and Rakin does not really dispute that assertion. Instead, Rakin focuses on the last factor mentioned in *Richardson*: the interrogator's use of threats, promises, and deception to induce the defendant to confess. Rakin argues that Schletz capitalized on Rakin's obvious concern for Maise's situation as well as his desire not to see his son charged for allegedly handing Rakin a gun, and that Schletz made promises of leniency toward Maise[1] that went beyond simply urging Rakin to be truthful and amounted to a prohibited *quid pro quo* in return for his confession to shooting Davis. Rakin also points to Schletz's suggestion that Rakin could face lesser or even no charges if he confessed, and to Schletz's lies about Rakin's fingerprints being found on the gun

---

[1] It appears to be an open question whether a promise of leniency for someone other than the defendant can qualify as equally coercive as a promise of leniency for the defendant himself— neither Rakin nor the State raised this specific argument or cited any case law on the issue. We therefore express no opinion on the issue and for the purposes of the current case simply proceed as if a promise of leniency for someone else can qualify as equally coercive.

used in the shooting and there being inculpatory video of the events of that night. (In fact, there was no forensic evidence tying Rakin to the shooting.) He argues that, in light of all of these promises and deceptions, his confession cannot be considered voluntary and should have been suppressed.

¶ 48    Rakin's legal argument rests primarily on two cases: a century-old supreme court decision, *People v. Heide*, 302 Ill. 624 (1922), and an appellate court decision, *People v. Ruegger*, 32 Ill. App. 3d 765 (1975). These cases do not demonstrate error here, however, as we explain.

¶ 49    The *Heide* decision includes some powerful language that seems to compel the conclusion Rakin urges here, that a confession induced by police promises is inadmissible. "The rule is that a confession obtained under any promise or hope of immunity is not admissible in evidence," and "a confession becomes incompetent whenever any degree of influence has been exerted by any person *** tending to cause duress or hope of leniency." *Heide*, 302 Ill. at 627. These statements suggest that, where the police have promised or even created a hope of leniency if a defendant confesses, the confession cannot be used, regardless of the other circumstances of the questioning and characteristics of the defendant.

¶ 50    The absolutist approach of *Heide* is no longer the standard, however. Instead, as the supreme court has more recently confirmed, police promises, threats, and deception are simply one factor among the many to be weighed in determining whether a confession is voluntary. See *Murdock*, 2012 IL 112362, ¶ 30 ("No single factor is dispositive" and police threats or promises may be considered one aspect of "whether there was any physical or mental abuse by the police,"); see also *Richardson*, 234 Ill. 2d at 253 (no one factor is dispositive; rather, a court must consider

all of the circumstances in the case before it).[2]  In accord with this multifactorial "totality of the circumstances" approach, appellate courts have repeatedly held that a defendant's statement is not *per se* inadmissible if all of the circumstances, taken together, indicate that it was made voluntarily. See *People v. Lee*, 2012 IL App (1st) 101851, ¶ 34; see also *People v. Veal*, 149 Ill. App. 3d 619, 623 (1986) ("even where promises or suggestions of leniency have been made, the confession is not necessarily inadmissible"; instead, "[t]he ultimate question is whether, considering the totality of the attendant circumstances, defendant's will was overcome at the time he confessed"); *People v. Jones*, 8 Ill. App. 3d 849, 853 (1972) ("although threats or promises may have been made, [if] the evidence as a whole shows that a statement was made voluntarily," it is admissible in evidence).

¶ 51    Here, when considering all of the relevant factors, including Rakin's age, intelligence, ample experience with the criminal justice system, and the relatively short duration and respectful atmosphere of the interrogation, we conclude that Schletz's promises and suggestions of leniency and lies to Rakin did not overcome his will and render his confession involuntary.  Rakin stresses that he did not confess to the shooting until Schletz said that if Rakin confessed to the shooting, the police would let Maise go.  That is not quite the way the interview unfolded, however.  Rakin did make it clear that he was worried about what would happen to Maise, asking about her situation right at the start of the interrogation.  Schletz told him accurately that, although the Racine police might want to know whether she was involved with the drugs in the motel room, he and his partner

---

[2] For an excellent historical analysis of the legal basis for the *Heide* decision and the evolution toward the adoption of the "totality of the circumstances" standard, including the relevant United States Supreme Court decisions, see *People v. Phillips*, 2018 IL App (3d) 130270, ¶ 65 (Holdridge, J., dissenting).

(who were solely interested in Davis's shooting) did not view her as a suspect. Asserting that Maise had nothing to do with either the drugs or the shooting, Rakin immediately stated that the drugs were his. However, he still refused to say who shot Davis, let alone that he did. Instead, for an hour and a half, Rakin continued to say that he would not talk about the shooting, despite Schletz stressing (among other things) Maise's trust in Rakin and her vulnerability as a young woman with a child. During that time, Rakin demonstrated his intelligence and knowledge of the criminal justice system by bluntly dismissing Schletz's attempts to suggest that, by "telling his side of the story," Rakin could influence the charges brought against him and affect the length of any sentence he might eventually receive. Rakin accurately noted that, with a gun involved, any admission he might make would result in him going to prison for the rest of his life, regardless of the charges.

¶ 52 Moreover, although Schletz stated that Maise still faced an outstanding warrant or possible charges in connection with Davis's shooting as long as that shooting remained unresolved, he also repeated that he did not believe that she was involved. It was not until after a long pause during which Rakin appeared to be confronting the likelihood that he would be charged with Davis's shooting regardless of whether he made a statement, that Rakin asked Schletz whether, if he confessed to shooting Davis, the police would release Maise. Rakin, not Schletz, initiated this offer, apparently seeking to negotiate some advantage for those he cared about in return for his confession. Nor was Schletz's response quite the immediate and specific promise of leniency that Rakin portrays. Although Schletz responded "absolutely" to Rakin's question, Schletz immediately followed that up by clarifying the limited extent of his power, saying only that he would make recommendations or suggestions to others. Schletz promised that he would "absolutely" speak to the Racine police and the State's attorney on Maise's behalf, not that she would "absolutely" be released and any charges against her dropped. See *People v. Hubbard*, 55

Ill. 2d 142, 152 (1984) (promise to tell the prosecutor of the defendant's cooperation was not a "promise of leniency"); *People v. Eckles*, 128 Ill. App. 3d 276, 278 (1984) (police promises to tell the prosecutor and judge of the defendant's cooperation were not specific promises of leniency, as would be required to raise an issue about voluntariness of the defendant's confession). The record does not support Rakin's argument that Schletz made a specific promise of leniency for Maise or improperly offered a deal in return for Rakin's confession to the shooting.

¶ 53 Rakin also points out that Schletz engaged in deception, falsely telling Rakin that his fingerprints were found on the murder weapon and that there was incriminatory video footage of him near the location where the gun was found. Deception by police interrogators is not *per se* unlawful. *People v. Patterson*, 2014 IL 115102, ¶ 76. However, it can contribute to a coercive atmosphere and weigh against a finding of voluntariness. *Id*.

¶ 54 Here, Rakin's statements during the interrogation show that he accepted Schletz's misrepresentations as true, and thus they can fairly be said to have factored into his decision to confess to shooting Davis. Nevertheless, in considering the totality of the circumstances surrounding Rakin's confession, the great weight of the factors support a finding that Rakin confessed voluntarily. On the specific issue of Rakin's ability to assess the evidence against him, we note that, although there was no forensic evidence linking Rakin to the shooting, there was considerable eyewitness testimony that he shot Davis. Even if Rakin had known that there was no forensic evidence against him, he also knew how many people were present when the shooting occurred and could assess the likelihood that he would be identified as the shooter through alternate means. For all of these reasons, we agree with the trial court that Rakin's will was not overcome by Schletz's questioning of him and that his confession was made voluntarily.

¶ 55                              B. Improper Rule 431(b) Questioning

¶ 56   Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) requires a trial court, as part of *voir dire*, to

"ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects."

¶ 57   As can be seen from the plain language of the rule, the trial court must ask potential jurors both whether they understand these principles and whether they accept them. *Id.*; see also *People v. Belknap*, 2014 IL 117094, ¶¶ 44-45 (discussing Illinois Supreme Court cases requiring strict compliance with the rule). It is undisputed that the trial court in this case did not comply with Rule 431(b), as it failed to ask several panels of potential jurors whether they not only understood but also accepted the first principle, the presumption of innocence. The question before us is the proper effect of this failure, given that the defendant failed to object to the error either when it was made or in his posttrial motion for a new trial. The defendant raises this error for the first time on appeal.

¶ 58   "It is well settled in Illinois that an appellant who fails to raise an issue before the trial court forfeits the issue and may not raise it for the first time on appeal." *Williams v. Bruscato*, 2019 IL App (2d) 170779, ¶ 24 (citing *In re Shauntae P.*, 2012 IL App (1st) 112280, ¶ 93). That rule of forfeiture may be relaxed in narrow circumstances if the error qualifies as "plain error," that is, a substantial error.

"Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967) memorializes the plain-error doctrine:

'Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court.'

The plain-error doctrine does not create a 'general saving clause' to allow defendants to escape the consequences of their nonfeasance. [Citation.] Instead, it offers a narrow exception to the rule of procedural default for unpreserved errors. [Citation.] Whether there is plain error is a question of law, which we review *de novo*." *People v. Williams*, 2022 IL 126918, ¶ 48.

¶ 59    In order to successfully qualify for application of the plain error doctrine, a defendant must first show that the trial court committed a clear or obvious error. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). After meeting this threshold, the defendant must then show "either that (1) the evidence *** was closely balanced, or (2) the error was so egregious as to deny the defendant a fair *** hearing." *Id*. If the defendant cannot meet this burden, then the error remains forfeited. *Id*.

¶ 60    Here, the threshold inquiry is satisfied: the State agrees that the trial court's failure to question all of the prospective jurors about whether they accepted the presumption of innocence was a clear or obvious error. It is also well-established that the second avenue for plain-error relief is not open to Rakin, as errors in applying Rule 431(b) do not necessarily result in a biased jury and thus are not structural errors that by themselves require reversal. *Belknap*, 2014 IL 117094, ¶ 47 (citing *People v. Thompson*, 238 Ill. 2d 598, 610-11 (2010)). Thus, Rakin's failure to preserve this error in the trial court can be overcome only if he can show that the evidence was "so closely

balanced that the error alone threatened to tip the scales of justice against the defendant." *Id*. ¶ 48 (citing *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)). In evaluating whether the evidence was closely balanced, a court must perform a commonsense qualitative analysis—that is, one that considers all of the evidence in context, including the plausibility of each side's explanation of that evidence—not simply a quantitative review that considers only the amount of evidence introduced by each side. *Id*. ¶¶ 50, 53.

¶ 61    In this case, the closeness-of-the-evidence inquiry really applies only to one issue: whether the State disproved Rakin's claim that he shot Davis in self-defense (or imperfect self-defense). At trial, Rakin did not dispute that he knowingly shot toward Davis or that his shots caused her death, and thus the only question was whether that shooting was justified in whole or in part. Rakin argues that the evidence regarding self-defense (imperfect or otherwise) was closely balanced and that he put forward a plausible defense that was corroborated by other evidence. The record does not support his argument.

¶ 62    "Self-defense is an affirmative defense, and once it is raised, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, in addition to proving the elements of the charged offense." *People v. Gray*, 2017 IL 120958, ¶ 50. A claim of self-defense has six elements. *Id*. "If the State negates any one of these elements, the defendant's claim of self-defense necessarily fails." *Id*.

¶ 63    Among the elements for self-defense is that the defendant actually and subjectively believed a danger existed that required the use of the force that was applied. *Id*. Here, the evidence on that element was not closely balanced, and thus the defense as a whole was not established. Although it was clear that Davis was enraged and was intentionally ramming Rakin's car, the State showed, through Rakin's own words in his videotaped statement, that he was not subjectively

afraid that Davis was trying to run him over or kill him. Rather, he believed that she was focused on damaging his car, saying that Davis "didn't try to run me over and I didn't think she was going to try to run me over." He repeated this at least twice more, saying that Davis was not trying to hit him with her car or run him over, even though she was enraged and willing to strike him if he got in her way. At trial, Rakin contradicted his earlier statement, testifying that he felt he was in danger and was afraid that Davis might hit him or run him over. A jury could well discount this testimony as being based on legal strategy and less credible, however, especially in light of his admission that he had lied to Schletz about where he got the gun. Rakin also testified that, far from firing blindly out of fear (or going back inside the house), he "decided" to shoot toward Davis to stop her car, and he even thought things through enough that he decided to fire the gun (which he asserted he had never fired before) with his nondominant hand. This testimony was far less credible than his earlier version of events in his confession.

¶ 64    The forensic evidence also supported the conclusion that Rakin was not in imminent danger when he shot Davis. Although Davis was driving forward and backward along the northern half of the driveway in order to ram Rakin's car, Rakin fired from the side of the car, not in front of it. The shots that killed Davis came through the front passenger side window, not through the windshield. This in itself showed that Rakin was not in Davis's path when he shot her, supporting the version of events that he told the police and undermining his trial testimony that he was afraid she would hit him. And although the shell casings could have been kicked or moved as people left the party, their distribution is generally along the length of the driveway, supporting the inference that Rakin walked toward Davis's car as he fired, an action that again undermined his insistence that he shot toward her out of fear. (Although the distribution of the shell casings could also indicate that Rakin was retreating as he fired, he never suggested that he retreated in either his

police statement or at trial, nor did any other witness.) For all of these reasons, the evidence regarding Rakin's lack of a subjective belief that he was in danger was not closely balanced. As Rakin has not shown plain error, his forfeiture of his Rule 431(b) argument is not excused. *Hillier*, 237 Ill. 2d at 545. We therefore decline to consider this argument.

¶ 65                          C. Admissibility of Bronson's Statements

¶ 66    Rakin next challenges the trial court's admission of several statements by Bronson that he contends were nothing more than improper speculation about Davis's state of mind. He points out that the defense specifically sought and obtained a pretrial order barring such testimony. The State argues that the admitted statements were simply Bronson's inarticulate description of the movements of Davis's car, which were based on her observations of those movements and were therefore admissible. The State concedes, however, that Bronson's description also contained her own interpretation that the movements of Davis's car showed that Davis planned to leave and was backing into the street, turning her steering wheel, and preparing to drive forward down the street, away from Rakin. The State argues that Bronson's statements about Davis's plans were unsolicited and were incidental to her testimony about her observations of the car's movements, which she had trouble explaining, and therefore their admission was not an abuse of discretion. Alternately, the State argues that Bronson's statements were harmless error.

¶ 67    The statements at issue are as follows.

"Q [prosecution]. And was the female's car backing up at the time the defendant was shooting?

THE WITNESS: My opinion on the outside of the car from what I—it looking like she was [preparing] to pull off.

* * *

Q. Why do you think she threw the car in drive?

A. Well, it perceived to me like she was [preparing] to pull off.

* * *

Q. In which direction was it rolling?

A. She was reversing. So I would say heading straight. So like heading like she was [preparing] to bust a U-turn. You know how you straighten the wheel up and take off?

* * *

A. She was [preparing] to take off, I thought is what it looked like."

Although the defense objected to the first three statements, the trial court overruled the objections. The defense then moved to strike all of these statements, but the trial court denied the motion, saying that the defense could go into the basis for Bronson's statements on cross-examination if it wished.

¶ 68    The determination of whether evidence is admissible is within the sound discretion of the trial court, and we will not reverse that determination unless there has been a clear abuse of its discretion. *People v. Montano*, 2017 IL App (2d) 140326, ¶ 74. A trial court abuses its discretion when its ruling is arbitrary, fanciful, or unreasonable, or no reasonable person would take the view adopted by the trial court, or when its ruling rests on an error of law. *People v. Olsen*, 2015 IL App (2d) 140267, ¶ 11.

¶ 69    Rakin argues that the trial court's rulings allowing Bronson's statements to stand were an abuse of discretion. "It is well settled in Illinois that the testimony of a lay witness must be confined to statements of fact of which the witness has personal knowledge." *People v. Brown*, 200 Ill. App. 3d 566, 579 (1990); see also Ill. R. Evid. 602 (eff. Jan. 1, 2011). Witnesses can testify about a person's actions, words, or facial expressions, as such testimony is based on observation

and therefore is within the scope of a witness's firsthand knowledge. *People v. Ward*, 2021 IL App (2d) 190243, ¶ 65. However, a witness cannot testify to the intentions of another person. *Id*. ¶ 72.

¶ 70    The State does not dispute these general principles but argues that Bronson's testimony falls within an exception to them. Opinion testimony by a lay witness is permissible when it is "based upon his or her observations where it is difficult to reproduce for the jury the totality of the conditions perceived and where the opinion given is one that persons, in general, are capable of making and understanding." *People v. Crump*, 319 Ill. App. 3d 538, 542 (2001). We observe that Illinois Rule of Evidence 702 (eff. Jan. 1, 2011) similarly reflects this approach to opinion testimony by lay witnesses:

> "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

The State argues that Bronson had difficulty describing what she saw as Davis backed her car out of the driveway the final time, but the movements of a car turning after backing out of a driveway before proceeding down a street are familiar to most persons and Bronson's opinions about what the movements she observed signified were rationally based on her perceptions and were helpful to the jury's understanding of her testimony. Thus, the State argues, the trial court's decision to allow the testimony was not an abuse of discretion.

¶ 71    Although it is a close question, we agree with the State that, while Bronson could not testify to Davis's intentions, she could testify to her own interpretation of the movements of Davis's car.

Before making the statements at issue, Bronson testified that she saw Davis drive forward and backward along the driveway several times as Davis rammed Rakin's car. Davis then backed out of the driveway into the roadway far enough that Davis's car hit Bronson's vehicle parked across the street from the driveway. Bronson heard shots. Although Bronson conceded that she did not hear Davis change gears, she believed that Davis put her car in drive and the car began moving in a way that made Bronson think it was about to proceed down the street. After the second shot, however, Davis's car began rolling. This testimony provided background information about the basis for Bronson's opinion that Davis was turning her car as the shooting occurred. Thus, the trial court did not abuse its discretion by permitting that testimony to stand.

¶ 72 We also agree with the State that, even if the trial court erred by allowing Bronson's opinion testimony, that error was harmless in light of the other evidence. An evidentiary issue is harmless when no reasonable probability existed that the jury would have acquitted the defendant absent the error. *In re E.H.,* 224 Ill. 2d 172, 180 (2006). In determining whether an error is harmless, relevant considerations include (1) whether the error might have contributed to the conviction; (2) whether the other properly admitted evidence overwhelmingly supported the conviction; and (3) whether the improperly admitted evidence had minimal effect because it was " 'merely cumulative or duplicates properly admitted evidence.' " *In re Brandon P.*, 2014 IL 116653, ¶ 50 (quoting *In re Rolandis G.*, 232 Ill. 2d 13, 43 (2008)).

¶ 73 The question of whether Davis was driving toward Rakin's car to ram it again or turning the car before driving away was certainly relevant to some elements of Rakin's self-defense claim, such as whether he faced imminent danger from Davis and the reasonableness of any belief he had that he needed to use deadly force to defend himself. See *People v. Gray*, 2017 IL 120958, ¶ 50 (listing the elements of self-defense). However, Rakin's defense required that he show all six

elements, and the absence of any one element was fatal. *Id*. As we have discussed, Rakin's confession effectively negated one of those elements—that he feared for his life when he shot toward Davis—because he repeatedly told Schletz that he did not. In light of the fact that Rakin admitted that he shot Davis and caused her death, and that he himself negated an essential element of his self-defense claim, his conviction was overwhelmingly supported by the properly admitted evidence.

¶ 74 We also note that Bronson's opinion testimony was cumulative to other evidence, and was less likely to have been relied upon than that other evidence. Specifically, there was photographic evidence that Davis's car came to rest in a diagonal position in the street, its wheels were turned in the direction of the street rather than the driveway, and bullets had struck the side window rather than the front windshield. This was objective evidence regarding the movements of Davis's car in relation to Rakin for the jury to consider, unlike Bronson's testimony, which was impeached by the contradictory and confusing nature of her testimony as well as her admission that she was drunk and had consumed marijuana and ecstasy during the hours before the shooting.

¶ 75 Considering all of these factors, we conclude that, even if the trial court had abused its discretion in admitting Branson's interpretation of Davis's car's movements, there was no reasonable probability that the jury would have acquitted Rakin absent that error. See *In re E.H.*, 224 Ill. 2d at 180.

¶ 76 D. Consideration of Improper Sentencing Factors

¶ 77 Rakin's final argument is that the trial court erred by improperly considering, as a factor in aggravation, that his conduct caused or threatened to cause serious physical harm. Rakin argues that this factor is inherent in his offense of conviction—first degree murder—and thus should not have been separately considered by the trial court. Similarly, the trial court's comments indicated

that it gave weight to the fact that Rakin used a gun to kill Davis, although Rakin's sentence already included a mandatory add-on for his discharge of a firearm.

¶ 78    "It is well settled that the trial court has broad discretionary powers in imposing a sentence, and the trial court's sentencing decision is entitled to great deference." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). However, "[a]lthough the trial court is vested with wide discretion in sentencing, such discretion is not without limitation." *Id*. Section 5/5-5-3.2(a)(1) of the Unified Code of Corrections (730 ILCS 5/5-5-3.2(a)(1) (West 2016)) permits a court to consider, as an aggravating factor in sentencing, that a defendant's conduct "caused or threatened serious harm." However, it is improper for a court to rely on this factor when the causation of serious harm is inherent in the offense.

> "Generally, a factor implicit in the offense for which the defendant has been convicted cannot be used as an aggravating factor in sentencing for that offense. [Citation.] Stated differently, a single factor cannot be used both as an element of an offense and as a basis for imposing 'a harsher sentence than might otherwise have been imposed.' [Citation.] Such dual use of a single factor is often referred to as a 'double enhancement.' [Citation.] The prohibition against double enhancements is based on the assumption that, in designating the appropriate range of punishment for a criminal offense, the legislature necessarily considered the factors inherent in the offense." *People v. Phelps*, 211 Ill. 2d 1, 12 (2004).

¶ 79    Rakin was convicted of first degree murder, a conviction that necessarily includes as an element that he caused the death of another. See 720 ILCS 5/9-1(a) (West 2016). Thus, it would be improper for the trial court to have considered, as an aggravating factor, that he caused serious harm to Davis if the harm considered by the trial court was that Rakin caused Davis's death. See

*People v. Saldivar*, 113 Ill. 2d 256, 272 (1986). Similarly, as Rakin received a mandatory statutory 25-year add-on to his sentence for personally discharging a gun (730 ILCS 5/5-8-1(a)(d)(iii) (West 2016)), the trial court should not have considered, as an aggravating factor, that he used a gun to kill Davis.

¶ 80    The State points out that, even with a murder conviction, a trial court may consider the harm caused by a defendant's conduct as it pertains to circumstances apart from the victim's death, such as the force employed, the physical manner in which the victim's death was brought about, or the nature and circumstances of the offense. *Saldivar*, 113 Ill. 2d at 271. But a careful review of the trial court's comments shows that, in discussing the harm factor, the court was focused on the fact that Rakin had access to and used a gun, and caused Davis's death—not on other circumstances of Rakin's conduct and the harm he caused or threatened.

¶ 81    At the conclusion of the sentencing hearing, the trial court stated:

"I have to consider as a factor in aggravation that the defendant's conduct caused and threatened serious physical harm. I appreciate and hear the defense arguments that this was an impulsive act, albeit, intentional as found by the jury. However, when somebody picks up a handgun and it's loaded, by [its] very nature that action, once that handgun is discharged, causes and threatens serious bodily harm to another, which is the problem with handguns in our society."

The State suggests that these comments could be construed as referring to the threat of harm that shooting poses to others in the vicinity, especially when the shooting takes place in a residential area, as in this case. But the record simply offers no support for this argument—the trial court never referred to the residential setting or the danger to others posed by Rakin's shooting, only to the fact that Rakin had picked up a loaded handgun and shot at Davis. Under *Saldivar* and its

progeny, this was improper double consideration of elements of the offense and the mandatory add-on.

¶ 82    Rakin moved for a reconsideration of his sentence, arguing that the comment above showed that the trial court improperly relied on a factor inherent in his conviction.  In ruling on the motion, the trial court admitted that the transcript of the sentencing hearing showed that it did consider, as an aggravating factor, that Rakin caused harm to Davis, and it admitted that doing so was improper. It also once again emphasized that Rakin used a gun to kill Davis:

> "The Defense accurately points out that I did state *** that I considered a factor in aggravation that the Defendant's conduct caused or threatened serious physical harm.
>
> I suspect when I stated those things, I was looking at the totality of the situation and the totality of the events because the Defense is accurate that to consider the Defendant's conduct, specifically, as an aggravating factor, that it caused or threatened serious harm, and the fact that it is inherent in the offense of first degree murder, would not be a reason to enhance the sentence.
>
> The Court did, though I hope, accurately express my continuing remarks regarding what I considered in the sentencing when I came to the sentence of 60 years indicating that I considered the factors in totality with the actual facts that I heard at the trial, which caused the situation where Ms. Davis was unable to escape all of those bullets that were discharged at her in her vehicle, seven, two of them proving to be fatal.
>
> I also indicated that I also considered the Defendant's prior criminal history of delinquency and his criminal activity and other factors in aggravation.

I indicated that having due regard for the character of the offender, the nature and circumstances of the offense and the public interest on that, a disposition of imprisonment was appropriate.

And I indicated I came to the number that I came to because of the Defendant's other extensive prior criminal history.

And then, taking all those factors in their totality into consideration, the Court felt that *** a sentence of 60 years, given the number of times that the Defendant had been to prison previously was an appropriate sentence."

Notably, after admitting error, the court did not cure its error by asserting that it did not really rely on any improper factors in setting Rakin's sentence. Instead it stated that it also relied on proper factors such as Rakin's criminal history in setting Rakin's sentence, and denied the motion.

¶ 83    The trial court's assumption that its consideration of proper aggravating factors would necessarily cure its consideration of an improper factor is mistaken. Where, as here, the record shows clearly that the trial court relied in part on an improper factor in fashioning a defendant's sentence, we must remand for resentencing unless we can determine the weight given to the improper factor. *People v. Sanders*, 2016 IL App (3d) 130511, ¶ 13.

¶ 84    "A sentence based on improper factors will not be affirmed unless the reviewing court can determine from the record that the weight placed on the improperly considered aggravating factor was so insignificant that it did not lead to a greater sentence." *People v. Heider*, 231 Ill. 2d 1, 21 (2008). Here, as in *Heider*, the trial court repeatedly commented, both at sentencing and in ruling on the motion to reconsider, on the serious harm caused to Davis as well as the fact that Rakin used a readily available gun to kill Davis. See *id*. at 22 (highlighting the trial court's emphatic statements about the improper factor). And we cannot conclude that the court's consideration of

the improper factors was insignificant, as the sentence the court imposed on Rakin was 15 years above the minimum of 45 years. Compare *id*. at 24-25 (reliance on improper factor could not be deemed insignificant when the defendant received 4 years more than the minimum of a 6- to 30-year sentencing range). As we cannot rule out the possibility that the trial court's consideration of improper factors affected its judgment about the proper sentence, we must vacate that sentence.

¶ 85     Rakin asks that, upon remand, his case be assigned to a different judge for resentencing. Our supreme court has suggested that this is a proper course of action "to remove any suggestion of unfairness" (*id*. at 25; see also *People v. Woods*, 2018 IL App (1st) 153323, ¶ 39), and the State does not object. We therefore grant this request.

¶ 86                                III. CONCLUSION

¶ 87     For the reasons stated, the judgment of the circuit court of Lake County is affirmed as to Rakin's conviction. His sentence is vacated and the cause is remanded for resentencing to the chief judge of the criminal division to assign a new judge for resentencing.

¶ 88     Conviction affirmed; sentence vacated and cause remanded for resentencing.